IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VINAY K. KARNA        §
    Plaintiff, §
              §
              §
vs.               §      CIVIL ACTION NO.: 4:12-cv-00101
              §
BP CORPORATION    §
NORTH AMERICA, INC.    §
    Defendant. §

---

## DEFENDANT BP CORPORATION NORTH AMERICA, INC.'S
## AMENDED MOTION FOR SUMMARY JUDGMENT

---

Richard A. Schwartz
Ruth Karper
Schwartz Junell Greenberg & Oathout, L.L.P.
909 Fannin, Suite 2700
Houston, Texas 77010
(713) 752-0017
(713) 752-0327 (fax)

Attorneys for Defendant
BP Corporation North America, Inc.



## TABLE OF CONTENTS

I.   STATEMENT OF NATURE & STAGE OF PROCEEDING ...........................................1
II.  STATEMENT OF ISSUES & STANDARD OF REVIEW ...........................................1
III. SUMMARY ..........................................................................................................2
IV.  SUMMARY JUDGMENT EVIDENCE ................................................................2
V.   UNDISPUTED FACTS ........................................................................................2
     *Karna was an Independent Contractor Between 2005 and 2009* ................2
     *In 2009, Karna applied for Application Support Manager Position* ...............6
     *Karna started as WR5/ER5 Applications Support Manager in October 2009* ........7
     *Karna resigned from his position, effective March 5, 2011* ...............8
     *Karna sent letter regarding payments* ....................................9
VI.  ARGUMENT AND AUTHORITIES ...................................................................9
     A.   Karna's Quantum Meruit Claims Fail as a Matter of Law .........................9
          1.   The Allegations .............................................................................9
          2.   Karna cannot establish a claim for quantum meruit .................10
               a.   Express contracts cover Karna's services ...........................10
               b.   Karna has no evidence BP knew Karna expected payment
                    for time, if any, not billed pursuant to the contracts .........11
     B.   Karna's Breach of Contract Claim Fails as a Matter of Law .................12
          1.   The Allegations ...........................................................................12
          2.   Karna's Breach of Contract Claim Fails as a Matter of Law ........12
               a.   There is no written contract for the amounts claimed .......14
               b.   Karna has no evidence of a valid, enforceable oral
                    contract for the amounts claimed .....................................14
     C.   Karna's FLSA Claims ..........................................................................15
          1.   The Allegations ...........................................................................15
          2.   Karna's claim before May 2, 2009 is time-barred .......................15
          3.   Karna's FLSA Claims Fail as a Matter of Law ..........................16
               a.   August 2005-October 2009 Time Period .........................17
                    1)   Employee Status .................................................17
                    2)   Karna falls within the Computer Professional
                         Exemption .........................................................19
               b.   Between October 2009 and March 2011, Karna was exempt
                    from overtime as a highly compensated employee ...........21
     D.   Negligent Misrepresentation, Fraudulent Misrepresentation, and
          Promissory Estoppel ..........................................................................23
          1.   The Allegations ...........................................................................23
          2.   Karna's Claim for Negligent Misrepresentation and Fraud Fail as a
               Matter of Law .............................................................................24
               a.   Karna has no evidence BP made a false statement of
                    existing fact ...........................................................25
               b.   Karna has no evidence that he justifiably relied on the
                    statements ..............................................................26
               c.   Karna sustained no damages as a result of any alleged
                    misrepresentations ..................................................27

i

3.    Karna's Promissory Estoppel Claim Fails as a Matter of Law......27

        a.    The Allegations................................................................27

E.    Unlawful Employment Practices ................................................................28

    1.    The Allegations................................................................28

    2.    Karna's Unlawful Employment Claim Fails as a Matter of Law ..28

        a.    Karna has no evidence he was required to perform an illegal act which carries criminal penalties.......................29

        b.    Karna has no evidence he was constructively discharged ...........................................................................29

        c.    Karna has no evidence that the sole reason for his resignation was a refusal to perform an illegal act ............30

VII.    Prayer ................................................................................................................30

00219934.1

# TABLE OF AUTHORITIES

**Cases**

*Airborne Freight Corp. v. C.R. Lee Enters.,*
847 SW.2d 289 (Tex. App.—El Paso 1992, writ denied) .........................................................25

*Allied Vista, Inc. v. Holt*
987 S.W.2d 138, 141 (Tex. App. —Houston [14th Dist.] 1999, pet. denied ..................24, 25, 28

*Bashara v. Baptist Mem'l Hosp. Sys.,*
685 S.W.2d 307 (Tex. 1985) ...............................................................................................10

*Beverick v. Koch Power, Inc.,*
186 S.W.3d 145 (Tex. App.—Houston [1st Dist] 2005, pet. denied) .......................................13

*County Domingo v. Mitchell,*
257 S.W.3d 34 (Tex. App.—Amarillo 2008, no pet.) ............................................................13

*Cox v. Brookshire Grocery Co.,*
919 F.2d 354 (5th Cir. 1990) ...............................................................................................16

*Federal Exp. Corp. v. Dutschmann,*
846 S.W.2d 282 (Tex. 1993) ................................................................................................28

*Federal Land Bank Ass'n v. Sloan,*
825 S.W2d 439 (Tex. 1991) .................................................................................................24

*Gilmartin v. KVTV-Channel 13,*
985 S.W.2d 553 (Tex. App.—San Antonio 1998, no pet.).........…………………………24, 27

*Grant Thornton LLP v. Prospect High Income Fund,*
314 S.W.3d 913 (Tex. 2010) ................................................................................................26

*Hammond v. Katy Indep. Sch. Dist.,*
821 S.W.2d 174 (Tex. App.—Houston [14th Dist.] 1991, no writ) ...................................29, 30

*Harvil v. Westward Comm., L.L.C.,*
433 F.3d 428 (5th Cir. 2005) ...............................................................................................16

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.,*
161 F.3d 299 (5th Cir. 1998) ...............................................................................................17

*IKON Office Solutions, Inc. v. Eifert,*
125 S.W.3d 113 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)....................................24

00219934.1

*Jones v. Willy, P.C.*,
    No. H-08-3404, 2010 WL 723632 (S.D. Tex. Mar. 1, 2010) ....................................................16

*Junior v. Texaco, Inc.*,
    688 F.2d 377 (5th Cir. 1982) .................................................................................................30

*Manon v. Solis*,
    142 S.W.3d 380 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)..................................25

*Melton v. Teachers Ins. & Annuity Ass'n of Am.*,
    114 F.3d 557 (5th Cir. 1997) ...................................................................................................1

*Meru v. Huerta*,
    136 S.W.3d 383 (Tex. App.—Corpus Christi 2004, no pet.) ..................................................15

*Phillips v. Goodyear Tire & Rubber Co.*,
    651 F.2d 1051 (5th Cir. 1981) ...............................................................................................28

*Prime Prods., Inc. v. S.S.I. Plastics, Inc.*,
    97 S.W.3d 631 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ................................12, 13

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947).................................................................................................................17

*Sabine Pilot Service, Inc. v. Hauck*,
    687 S.W.2d 733 (Tex. 1985) ..........................................................................................1, 28, 29

*Samson v. Apollo Res., Inc.*
    242 F.3d 629 (5th Cir. 2001) .................................................................................................16

*T.O. Stanley Boot Co. v. Bank of El Paso*,
    847 S.W.2d 218 (Tex. 1992) ..................................................................................................15

*Truly v. Austin*,
    744 S.W.2d 934 (Tex. 1988) ..................................................................................................10

*Wal–Mart Stores, Inc. v. Lopez*,
    93 S.W.3d 548 (Tex. App.-Houston [14th Dist.] 2002, no pet.) ........................................13, 14

*White v. FCI USA, Inc.*,
    319 F.3d 672 (5th Cir. 2003) .................................................................................................29

*Wohlfahrt v. Holloway*,
    172 S.W.3d 630 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)..................................12

iv

*Woodard v. Southwest States, Inc.,*
   384 S.W.2d 674 (Tex. 1964) ..................................................................................11

## Statutes

29 C.F.R. § 541.200...................................................................................................23
29 C.F.R. § 541.201...................................................................................................23
29 C.F.R. § 541.400............................................................................................19, 20
29 C.F.R. § 541.402...................................................................................................23
29 C.F.R. § 541.601............................................................................................21, 22
29 C.F.R. § 541.700...................................................................................................20
29 U.S.C. § 207.........................................................................................................16
29 U.S.C. § 213....................................................................................................19, 20

## Rules

Fed. R. Civ. P. 56………………………………………………………………….. 1

00219934.1

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VINAY K. KARNA<br>      Plaintiff, | §<br>§<br>§ | |
| vs. | §<br>§ | CIVIL ACTION NO.: 4:12-cv-00101 |
| BP CORPORATION NORTH<br>AMERICA, INC.<br>      Defendant. | §<br>§<br>§<br>§ | |

## DEFENDANT BP CORPORATION NORTH AMERICA, INC.'S
## AMENDED MOTION FOR SUMMARY JUDGMENT

Defendant, BP Corporation North America, Inc. ("BP"), respectfully files this Motion for Summary Judgment and would show the Court as follows:

### I.      STATEMENT OF NATURE & STAGE OF PROCEEDING

On May 2, 2011, Vinay K. Karna ("Karna") filed suit in state court against BP Corporation North America, Inc. for implied contract and breach of contract relating to his compensation.  On January 9, 2012, Karna filed an amended petition adding claims under the FLSA, and for negligent and fraudulent misrepresentation, promissory estoppel, and wrongful termination under *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).  BP removed the case on January 11, 2012.  Discovery concluded on December 7, 2012.  Trial is set for April 8, 2013.

### II.      STATEMENT OF ISSUES & STANDARD OF REVIEW

BP seeks summary judgment on all of plaintiff's claims.  Determination of this motion is governed by the well established standards of Rule 56, Fed. R. Civ. P.  The standard of review for summary judgment is *de novo*.  *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997).

1

### III.   SUMMARY

In essence, Karna asserts BP failed to pay Karna for overtime hours worked between 2005 and 2009, failed to pay Karna an agreed salary and bonus amount between 2009 and 2011, and then constructively discharged Karna for refusing to violate the law.  He asserts claims for quantum meruit, breach of contract, negligent misrepresentation, fraud, promissory estoppel and wrongful termination.  All of the claims should be dismissed because Karna cannot raise a fact issue regarding one or more elements of each claim.

### IV.   SUMMARY JUDGMENT EVIDENCE

In support of this Motion for Summary Judgment, BP incorporates by reference the documents in the Appendix.

### V.   UNDISPUTED FACTS

***Karna was an Independent Contractor Between 2005 and 2009.***

From August 2005 to October 2009, Karna worked as an SAP BW coordinator at BP through Ideal Staffing Services ("Ideal").[1]   During that time, Karna's work was covered by three contracts—Supplier Agreements—that he or his representatives entered into with Ideal.[2]   In turn, Ideal had a contract—a Professional Services Agreement—with BP to place consultants at BP.[3]

---

[1]   Karna Depo., Ex. B-1, p. 54, line 11 to p. 55, line 23; Deep Contract, Ex. D-1, IDEAL STAFFING 35-39; LSR Contract, Ex. D-2, IDEAL STAFFING 6-10; RD Data Contract, Ex. D-3, IDEAL STAFFING 20-24. The Supplier Agreements were between Ideal and Deep Consulting, LSR Consulting, and RD Data Solutions respectively.  *Id.*  Karna owns LSR and Deep, and signed as principal of RD Data.  Karna Depo., Ex. B-1, p. 35, lines 9-12, p. 41, lines 13-21; LSR Contract, Ex. D-2, IDEAL STAFFING 20-24.

[2]   Karna Depo., Ex. B-1, p. 54, line 11 to p. 55, line 23; Deep Contract, Ex. D-1, IDEAL STAFFING 35-39; LSR Contract, Ex. D-2, IDEAL STAFFING 6-10; LSR Contract, Ex. D-2, IDEAL STAFFING 20-24. The Supplier Agreements were between Ideal and Deep Consulting, LSR Consulting, and RD Data Solutions respectively.  *Id.*  Karna owns LSR and Deep, and signed as principal of RD Data.  Karna Depo., Ex. B-1, p. 35, lines 9-12, p. 41, lines 13-21; LSR Contract, Ex. D-2, IDEAL STAFFING 20-24.

[3]   PSA & Am. (Nov. 2, 2000), Ex. D-4, IDEAL STAFFING 43-94.

2

The Supplier Agreements state Karna is an independent contractor and not an employee of Ideal or BP.[4] The Professional Services Agreement states Ideal is responsible for all employer obligations toward its employees and agents and BP is not an employer, co-employer, or joint employer of Ideal's employees.[5]

The Supplier Agreements and Professional Services Agreement provide for Karna to submit invoices to Ideal, for Ideal to bill BP, and for Karna to be paid by Ideal at the same rate for all hours worked.[6] Thereafter, Karna submitted his time into BP's system and invoices to Ideal.[7] Ideal submitted invoices to BP through BP's procurement system. BP paid Ideal; Ideal paid Deep, LSR, or RD Data; and, in turn, Deep, LSR, or RD Data paid Karna.[8] Karna received his straight hourly rate for the number of hours he submitted.[9]

Initially, BP paid Ideal $157.50 per hour and Ideal paid Karna $147.50 per hour.[10] Starting in March 2009, Ideal paid Karna $132.75 per hour.[11] From 2006 to 2009, Ideal issued

---

[4]   Karna Depo., Ex. B-1, p. 60, lines 2-8, p. 61, lines 15-21; Deep Contract, preamble & ¶¶ 2, 11, Ex. D-1, at IDEAL STAFFING 35-37; LSR Contract, preamble & ¶¶ 2, 11, Ex. D-2, at IDEAL STAFFING 6-8; RD Data Contract, preamble & ¶¶ 2, 11, Ex. D-3, at IDEAL STAFFING 20-22; PSA §§ 3.1 & 3.5, Ex. D-4, at IDEAL STAFFING 51, 53-54.

[5]   PSA §§ 3.1 & 3.5, Ex. D-4, at IDEAL STAFFING 51, 53-54.

[6]   PSA §§ 3.1, 4.3, Ex. D-4, at Deep Contract at Form & ¶ 5, Ex. D-1, at IDEAL STAFFING 36, 39; LSR Contract at Form & ¶ 5, Ex. D-2, at IDEAL STAFFING 7, 10; RD Data Contract at Form & ¶ 5, Ex. D-3, at IDEAL STAFFING 21, 24.

[7]   Karna Depo., Ex. B-1, p. 237, lines 3-6; *see, e.g.*, Deep Invoice (Sept. 5, 2005), Ex. D-5, IDEAL STAFFING 113-14; LSR Invoice (Feb. 19, 2006), Ex. D-6, IDEAL STAFFING 190-92; RD Data Invoice (Nov. 8, 2009), Ex. D-7, IDEAL STAFFING 494-501.

[8]   Karna Depo., Ex. B-1, p. 106, line 25 to p. 107, line 18, p. 238, lines 2-10.

[9]   Karna Depo., Ex. B-1, p. 237, lines 3-6. Starting on mid-2009, the Enterprise Systems began entering time into a system called Project Server. Adams Depo., Ex. B-2, p. 156, lines 9-19; McElhaney Depo., Ex. B-3, p. 118, lines 2-18. Project Server is a tracking system that is used by Enterprise Systems around project and support activities to try to keep track of what people are working on. McElhaney Depo., Ex. B-3, p. 117, p. 18 to p. 118, line 1. However, Project Server had no payment purposes. Karna Depo., Ex. B-1, p. 265, lines 19-22. It was to track how employees were spending their time. Adams Depo., Ex. B-2, p. 158, lines 2-21. It was never used to charge a business, pay an employee, or pay a contractor. Adams Depo., Ex. B-2, p. 156, line 20 to p. 157, line 19.

[10]  Karna Depo., Ex. B-1, p. 80, lines 16-24; p. 81, line 22 to p. 82, line 13; p. 133, line 16 to p. 134, line 7.

[11]  RD Data Invoice (Mar. 10, 2009), Ex. D-8, IDEAL STAFFING 450-51.

3

1099's to Deep, LSR, and RD Data for the following amounts: $380,259.86 in 2006; $362,353.90 in 2007; $352,082 in 2008; and $294,392.04 in 2009.[12]

Between August 2005 and October 2009, BP did not provide Karna health insurance or other employee benefits; Karna's companies received 1099's for Karna's work; Karna did work for companies other than BP;[13] Karna did SAP consulting work for other companies, and taught training courses in SAP BW,[14] Karna placed other independent contractors at BP and other companies, and Karna received referral fees for such employee placements.[15]

Karna's job title was SAP BW Coordinator.[16] His job was to manage two large projects and develop BP's WR5 application, a BW system.[17] "BW" or "Business Warehouse" is SAP's data warehouse software.[18] SAP is a major provider of sophisticated data management systems to large companies.[19] A data warehouse holds data which can be searched and, from that, reports rendered.[20] WR5 is a management information system that takes financial and transactional data and displays the information in a more user-friendly way for management to use.[21] BP used WR5 to create reports, such as profit and loss statements, cash flow statements, and balance sheet statements.[22]

---

[12]   ISS 1099s, Ex. D-9, IDEAL STAFFING 544-48.
[13]   Karna Depo., Ex. B-1, p. 34, lines 3-6; p. 34, lines 13-14; p. 203, lines 2-6; p. 274, lines 22-24; p. 276, lines 5-7.
[14]   *See, e.g.*, Karna Depo., Ex. B-1, p. 256, lines 9-20, p. 269, line 2 to p. 272, line 1; Resume (2009), Ex. C-2, at BP 102.
[15]   *See, e.g.*, Karna Depo., Ex. B-1, p. 147, line 9 to p. 148, line 10, p. 258, lines 19-24, p. 270, lines 4-18, p. 272, line 2 to p. 273, line 24.
[16]   LSR Contract, Ex. D-2, at IDEAL STAFFING 10; LSR Contract, Ex. D-2, at IDEAL STAFFING 24.
[17]   Adams Depo., Ex. B-2, p. 82, lines 1 to p. 84, line 2; Karna Depo., Ex. B-1, p. 130, lines 18-20.
[18]   Adams Aff't ¶ 4, Ex. C.
[19]   Adams Aff't ¶ 4, Ex. C.
[20]   Adams Aff't ¶ 4, Ex. C.
[21]   Adams Aff't ¶ 4, Ex. C.
[22]   Adams Aff't ¶ 4, Ex. C.

4

As of 2007, Karna described his work in his resume as: "Supervising and coordinating BW Projects" and he described himself as a data warehousing expert.[23]  In 2009, Karna's resume described his work as "4 years expert consultancy, project management, and applications management at BP."[24]

From approximately August 2005 to mid-2006, Karna, as Common SAP BW Standards, Design, and Construction Lead, oversaw the building and delivery of two projects by two different third party vendors and development of BP's WR5 application.[25]  He ensured that the projects were delivered on time and in a quality manner.[26]  From approximately May 2006 to the end of 2008, Karna provided the oversight of the support and stabilization of the WR5 system.[27]  In 2007 and 2008, Karna coordinated enhancements, continuous improvement in the system and processes, and correcting issues with the system arising from incorrect logic and functionality rule changes ("break/fix activities") of the WR5 system with third party vendor.[28]  From late 2008 to October 2009, Karna worked on migrating from BP's legacy BW system to WR5 along with continued coordination activities of WR5 enhancements and break/fix activities.[29]

As a SAP BW Coordinator, Karna was not given task level direction.[30]  He was given a program to manage.[31]  His supervisors assisted with issues and major decisions.[32]  Karna's job was to plan, schedule, and coordinate activities required to design, develop, build, enhance and

---

23   Karna Resume (2007), Ex. C-1, BP at 59.
24   Karna Resume (2009), Ex. C-2, BP 101-05 (emphasis omitted).
25   Adams Aff't ¶ 5, Ex. C; Adams Depo., Ex. B-2, p. 74, line 2 to p. 75, line 20.
26   Adams Aff't ¶ 5; Ex. C; Adams Depo., Ex. B-2, p. 74, line 14 to p. 75, line 20.
27   Adams Aff't ¶ 6, Ex. C; Adams Depo., Ex. B-2, p. 78, line 20 to p. 79, line 13, p. 84, line 18 to p. 86, line 10.
28   Adams Aff't ¶ 7, Ex. C.
29   Adams Aff't ¶ 8, Ex. C.
30   Adams Depo., Ex. B-2, p. 83, line 7 to p. 84, line 4, p. 84, line 18 to p. 86, line 10.
31   Adams Depo., Ex. B-2, p. 83, line 7 to p. 84, line 4, p. 84, line 18 to p. 86, line 10.
32   Adams Depo., Ex. B-2, p. 83, line 7 to p. 84, line 4, p. 84, line 18 to p. 86, line 10.

support the WR5 System, a very sophisticated computer program.[33]  In doing this, he reviewed

technical and functional design specifications[34] and computer coding for the WR5 system,

provided feedback to the third party vendors (the developer), consulted with the users (the

business) to understand its functional requirements, and then communicated that information to

the WR5 developers.[35]  Karna was then responsible for ensuring that the technical specifications

prepared by the developers expressed the business's functional specifications and complied with

BP internal standards.[36]  He coordinated the testing of the WR5 system and performed testing.[37]

He collaborated with users to determine necessary modifications.[38]  Once the system was

implemented, Karna responded to user inquiries, provided guidance, and participated in training

users on WR5.[39]  He then participated in the enhancement of the system.[40]

### *In 2009, Karna applied for Application Support Manager Position.*

On June 15, 2009, BP posted a WR5/ER5 Application Support Manager position.[41]

Karna applied for the job in July 2009.[42]

Daphne Adams, Karna's supervisor, conducted interviews and decided she would like to

offer the job to Karna.[43]  On August 18, 2009, McElhaney, another supervisor, received approval

to offer Karna a salary of $125,000 and sign-on bonus of $10,000.[44]

---

[33]     Adams Aff't ¶ 9, Ex. C.
[34]     A "functional design" is the business terminology describing the business requirements that they are going
to technically deliver.  A "functional design review" involves talking to the business to make sure IBM
understood what the business wanted in order to write the technical specifications.  Adams Aff't ¶ 9 n.1,
Ex. C.
[35]     Adams Aff't ¶ 9, Ex. C.
[36]     Adams Aff't ¶ 9, Ex. C.
[37]     Adams Aff't ¶ 9, Ex. C.
[38]     Adams Aff't ¶ 9, Ex. C.
[39]     Adams Aff't ¶ 9, Ex. C.
[40]     Adams Aff't ¶ 9, Ex. C.
[41]     Elliott Aff't ¶ 3, Ex. C.
[42]     Karna Resume (2009), Ex. C-2, BP 101-105; Karna Depo., Ex. B-1, p. 280, lines 2-6; p. 283, line 25 to p.
284, line 21.
[43]     Interviews Email (July 9, 2009), Ex. C-3, BP 100.
[44]     Salary Email, Ex. A-1, at BP 3494.

6

In September 2009, McElhaney met with Karna and offered the salary and sign-on bonus.[45] McElhaney also said he intended to pursue a "spot bonus" for Karna.[46] A spot bonus is separate from the normal salary program and is usually given as specific recognition for good performance on projects or an exceptional contribution to the team or company.[47]

On September 11, 2009, BP Human Resources sent Karna an email with an offer letter.[48] The letter said:

- BP is offering Karna the position of WR5/ER5 Application Support Manager, a Level G (Full-Time Exempt) position, with a semi-monthly salary of $5,208.33 (annualized at $125,000.00) and a "one-time sign-on payment of $10,000 (gross) contingent upon the successful completion of 30 days of employment."

- As a BP employee, Karna will participate in the "Variable Pay Plan (VPP) -- BP's annual bonus plan, starting with the next plan year (VPP provisions require employment of at least 3 months of the year to be eligible for an award)."

- "The target VPP for an employee at Level G is 15% of base pay" and "The amount of any VPP awarded is at the discretion of BP and subject to the terms and conditions of the program."

- "The employment offer and your employment are contingent upon" favorable reports on the identified pre-employment screenings and assessments.[49]

On September 23, 2009, Karna responded to the email and accepted the position.[50]

***Karna started* as *WR5/ER5 Applications Support Manager in October 2009.***

On October 19, 2009, Karna started working as the WR5/ER5 Applications Support Manager in the Enterprise System in the Information Technology & System group ("IT&S").[51] Karna reported directly to Daphne Adams, who reported to Dave McElhaney.

---

[45]   McElhaney Depo., Ex. B-3, p. 103, line 3 to p. 104, line 17.
[46]   McElhaney Depo., Ex. B-3, p. 127, lines 9-15, 21-24.
[47]   McElhaney Depo., Ex. B-3, p. 127, lines 16-20.
[48]   Elliottt Aff't ¶ 4, Ex. A; McElhaney Depo., Ex. B-3, p. 110, lines 5-22; Offer Letter , Ex. A-2, BP 611-78.
[49]   Offer Letter, Ex. A-2, at BP 613-615.
[50]   Elliott ¶ 5, Ex. A; Acceptance Email (Sept. 23, 2009), Ex. A-3, BP 679-81.
[51]   Elliott Aff't ¶ 6, Ex. A; Adams Aff't ¶ 10, Ex. C; Adams Depo., Ex. B-2, p. 151, lines 9-20; Karna Depo., Ex. B-1, p. 277, lines 17-21, p. 308, lines 4-8.

Karna received the $10,000 sign-on bonus on October 30, 2009[52] and his first full paycheck for $5,208.33 on November 13, 2009.[53]  McElhaney sought approval for a spot bonus and, on June 15, 2010, Karna was paid a spot bonus of 2,969.56.[54]

In this role, Karna was "responsible to deliver daily Business Warehouse/Management Information ("BW/MI") application support management and analysis services, ensuring timely response and resolution to support requests of . . . WR5/ER5."[55]  Karna supported several MI projects, which were adding onto the uses of WR5.[56]  He ensured those projects did not disrupt or negatively impact the existing operations and transitioned the projects from implementation into support.[57]  Karna coordinated all WR5 activities, including enhancements and project delivery, to ensure quality support services to the business.[58]  Karna managed third party vendors; trained and supported business users; designed remediation actions to resolve gaps in compliance with BP's standards for Sarbanes Oxley; and coordinated with other application managers.[59]  Karna also conducted technical and functional design reviews; reviewed computer coding for accuracy; oversaw testing; conducted testing; and identified solutions with the third party vendor.[60]

***Karna resigned from his position, effective March 5, 2011.***

On February 22, 2011, Karna sent an email resigning from his position at BP.[61]  He stated: "I hereby resign from BP, preferably leaving before 7th March.  Please let me know any

---

[52]   Karna Depo., Ex. B-1, p. 313, lines 3-9; Elliott Aff't ¶ 7, Ex. A; Earnings Statement (Oct. 30, 2009), Ex. A-4, BP 161.
[53]   Karna Depo., Ex. B-1, p. 313, lines 10-22; Earnings Statement (Nov. 13, 2009), Ex. A-5, BP 160.
[54]   Karna Depo., Ex. B-1, p. 314, lines 5-9; McElhaney Depo., Ex. B-3, p. 127, lines 9-15; Bonus Email, Ex. A-6, BP 327-28; Earnings Statement (June 15, 2010), Ex. A-7, BP 140.
[55]   Job Posting (June 15, 2009), Ex. A-8, BP 172-77.
[56]   McElhaney Depo., Ex. B-3, p. 24, lines 9-17.
[57]   McElhaney Depo., Ex. B-3, p. 24, lines 9-17.
[58]   Adams Aff't ¶ 13, Ex. C.
[59]   Adams Aff't ¶ 13, Ex. C.
[60]   Adams Aff't ¶ 13, Ex. C.
[61]   Resignation Email (Feb. 22, 2011), Ex. A-9, BP 198; Job Posting, Ex. A-8, BP 172-77.

8

requirement of notice. I love what I was doing but I need to move on. I will try to transition as smoothly as possible. Thanks so much."[62]  Karna's last day of work was March 4, 2011 and his resignation was effective on March 5, 2011.[63]

Karna received an "exceeds expectations" rating for the year 2010.[64]  On March 15, 2011, he received an 18% VPP bonus of $23,438, which is above the target level stated in his offer letter.[65]

***Karna sent letter regarding payments.***

On March 18, 2011, Karna sent a letter to Jo Ellen Hatfield, the Procurement Manager of BP North America, claiming that he was not paid for all of the hours he worked when he was a contractor.[66]  He stated:

> As I conclude my employment relationship with BP as WR5 Application Manager, I believe now is the appropriate time to request compensation for all unpaid hours that I worked at the company, as a contractor – BW Coordinator for systems WR5 and other, during the time period from August 2005 through October 2009.  As explained in this letter, the total amount that BP owes me is, at least $271,391, plus reasonable interest on that amount.[67]

On May 2, 2011, Karna filed this lawsuit.[68]

## VI.    ARGUMENT AND AUTHORITIES

**A.    Karna's Quantum Meruit Claims Fail as a Matter of Law.**

**1.    The Allegations.**

Karna alleges "BP failed to adequately compensate Karna for the services he rendered for the company."[69]  He alleges that "BP explicitly restricted Karna from submitting more than 50

---

[62]  Resignation Email, Ex. A-9, BP 198.
[63]  Elliott Aff't ¶ 9, Ex. A.
[64]  Elliott Aff't ¶ 10, Ex. A.
[65]  Karna Depo., Ex. B-1, p. 336, line 21 to p. 337, line 15; Elliott Aff't ¶ 10, Ex. A, Earnings Statement (Mar. 15, 2011), Ex. A-10, BP 130.
[66]  Elliott Aff't ¶ 11, Ex. A; Demand Letter (Mar. 18, 2011), Ex. A-11, BP 27-28.
[67]  Demand Letter, Ex. A-11, BP 27-28.
[68]  Pl.'s Original Pet. (May 2, 2011).

hours per week for billing to ISS, regardless of number of hours he actually worked," "BP routinely directed Karna (and others) to perform projects that it knew would require well in excess of 60 hours per week [and] demanded he work many additional hours," and "ISS paid Karna for no more than 50 hours per week during that time period. As a result, beginning in July 2006, Karna was not compensated for many hours he actually worked."[70]

### 2.  Karna cannot establish a claim for quantum meruit.

Quantum meruit is an equitable remedy based upon an implied promise to pay for benefits received.  The elements of quantum meruit are: (1) the plaintiff rendered valuable services or furnished materials; (2) to the defendant; (3) the defendant accepted and enjoyed the services or materials; and (4) the defendant had reasonable notice that the plaintiff expected payment.  *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985).

Karna's claim for quantum meruit fails because express contracts covered his services from August 2006 to October 18, 2009, and Karna has no evidence that BP had reasonable notice that Karna expected additional payment.

### a.  Express contracts cover Karna's services.

"As a general rule, a plaintiff who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in quantum meruit only when there is no express contract covering those services or materials."  *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988).  Karna's work on the BP WR5 project as an SAP BW Coordinator was covered by the Supplier Agreements executed by Ideal and Karna's representatives and the Professional Services Agreement executed by BP and Ideal.[71]  The Supplier Agreements state that they are the

---

[69]   Pl.'s Am. Pet. ¶ 6.

[70]   Pl.'s Am. Pet. ¶¶ 9-10.

[71]   PSA & Amendments (Nov. 2, 2000), Ex. D-4, IDEAL STAFFING 43-94; Deep Contract (Aug. 4, 2005), Ex. D-1, IDEAL STAFFING 35-39.

10

sole agreement between the parties, and supersede and replace all prior oral and written agreements.[72]   Karna's salary and benefits as a BP employee were set forth in the offer letter, which Karna accepted.[73]   Thus, express contracts cover the subject matter of Karna's claim, and he is not entitled to recover under the general rule of quantum meruit.   *See, e.g., Woodard v. Southwest States, Inc.*, 384 S.W.2d 674, 675-76 (Tex. 1964) (holding no recovery by plaintiff against defendant Woodard because plaintiff's contract was with another party, Woodard's independent contractor).

### b. Karna has no evidence BP knew Karna expected payment for time, if any, not billed pursuant to the contracts.

Karna has no evidence BP had reasonable notice that Karna expected payment for time not submitted for payment.   Karna admits that he was paid according to the number of hours he submitted in his timesheet.[74]

Karna may assert he worked more hours than submitted in the time sheets according to Project Server records for April 11, 2009 to October 18, 2009.   However, Project Server had no payment purposes.[75]   It was to track how employees were spending their time.[76]   It was never used to charge a business, pay an employee, or pay a contractor.[77]

Moreover, the first time Karna requested additional payment for any work as a contractor was in his letter dated March 18, 2011, a year and a half after the last date he worked as a

---

[72]    Deep Supplier Agreement ¶ 11, Ex. D-1, at IDEAL STAFFING 37; LSR Contract, ¶ 11, Ex. D-2, at IDEAL STAFFING 8; RD Data Contract ¶ 2, 11, Ex. D-3, at IDEAL STAFFING 22; LSR Contract (Feb. 1, 2006), Ex. D-2, IDEAL STAFFING 6-10; RD Data Contract (Nov. 1, 2006), Ex. D-3, IDEAL STAFFING 20-24.

[73]    Elliottt Aff't ¶ 4-5, Ex. A; McElhaney Depo., Ex. B-3, p. 110, lines 5-22; Offer Letter (Sept. 11, 2009), Ex. A-2, BP 611-78; Acceptance Email (Sept. 23, 2009), Ex. A-3, BP 679-81.

[74]    Karna Depo., Ex. B-1, p. 237, lines 3-6.

[75]    Karna Depo., Ex. B-1, p. 265, lines 19-22.

[76]    Adams Depo., Ex. B-2, p. 158, lines 2-21.

[77]    Adams Depo., Ex. B-2, p. 156, line 20 to p. 157, line 19.

contractor.[78]  The first time Karna claimed he was not paid the salary promised was after working in that job for a year and a half and receiving paychecks every month for the amount in the offer letter Karna had accepted. That Karna did not submit a request to be paid a different amount as a contractor or employee until one year and a half after his work as an independent contractor ended, and for the whole time he worked as an employee, is further evidence that Karna did not expect to be paid at the time he alleges services were rendered. *See Wohlfahrt v. Holloway*, 172 S.W.3d 630, 637 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding that, after providing services for 9-year period, plaintiff's submission of bill for services and demand for payment after the parties had a falling out and suit was filed is evidence that plaintiff did not expect to be paid at the time services were rendered.).

**B.      Karna's Breach of Contract Claim Fails as a Matter of Law.**

**1.      The Allegations.**

Karna alleges that BP offered and Karna accepted a base salary of $140,000, a sign-on bonus of $40,000, and a 30% year-end variable pay premium ("VPP", a year-end bonus) when Karna became a BP employee.[79]  He further alleges that BP refused to honor the agreement and, instead, paid Karna a base salary of $125,000, a sign-on bonus of $10,000, and an 18% VPP.[80]

**2.      Karna's Breach of Contract Claim Fails as a Matter of Law.**

To prevail on a breach of contract claim, Karna must prove that: (1) a valid contract existed between him and BP; (2) he performed or tendered performance; (3) BP breached the contract; and (4) Karna sustained damages as a result of the breach. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  There must be an offer, an acceptance, a meeting of the minds, each party's consent to the terms, and

---

[78]     *See* Demand Letter (Mar. 18, 2011), Ex. A-11, BP 27-28.
[79]     Pl.'s Am. Pet. ¶ 14.
[80]     Pl.'s Am. Pet. ¶ 15.

execution and delivery of the contract with the intent that it be mutual and binding.  *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex. App.—Houston [1st Dist] 2005, pet. denied) (*citing Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  Failure to satisfy any of these requirements will terminate a plaintiff's claim. *See, e.g.*, *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 152 (Tex. App.—Houston [1st Dist] 2005, pet. denied) (employee could not establish a valid contract due to lack of definite offer from employer).  To determine whether an oral contract exists, the court looks to the parties' communications and to the acts and circumstances surrounding those communications. *Beverick* , 186 S.W.3d at 150-51.

"To prove that an offer was made, a party must show (1) the offeror intended to make an offer, (2) the terms of the offer were clear and definite, and (3) the offeror communicated the essential terms of the offer to the offeree." *County Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Amarillo 2008, no pet.).  The acceptance must be identical to the offer and there must be a meeting of the minds with respect to the subject matter and essential terms of the contract. *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 556 (Tex. App.-Houston [14th Dist.] 2002, no pet.).  "A 'meeting of the minds' is a mutual understanding and assent to the expression of the parties' agreement." *County Domingo*, 257 S.W.3d at 39.  The determination of a meeting of the minds is based on an objective standard of what the parties said and did rather than on their subjective state of mind. *Wal–Mart Stores, Inc.*, 93 S.W.3d at 556.

Karna's claim fails because he has no evidence of a valid contract for a base salary of $140,000, a sign-on bonus of $40,000, and a 30% year-end variable pay premium ("VPP", a year-end bonus).

### a.   There is no written contract for the amounts claimed.

Karna has no evidence of a valid and enforceable written contract for a base salary of $140,000; sign on bonus of $40,000; and a 30% year-end bonus.   There is no such written contract.

### b.   Karna has no evidence of a valid, enforceable oral contract for the amounts claimed.

Karna has no evidence of an offer, acceptance, a meeting of the minds, and consent to the terms of any oral contract for the compensation claimed.   It is not enough to state that he thinks he made a contract.  The question of whether there was a valid contract must be based on objective standards looking at the parties' communications and actions.  *Wal–Mart Stores, Inc.*, 93 S.W.3d at 556.

Contrary to his testimony, the acts and circumstances show no oral contract existed as a matter of law. First, the offer letter clearly states Karna would be paid a base salary of $125,000, a sign-on bonus of $10,000, and an 18% VPP.[81]  BP performed in accordance with this offer for over a year.[82]  This performance shows no oral contract to the contrary.   Second, before Karna started as a BP employee, Karna knew he would be receiving less than a $140,000 base salary and $40,000 sign-on bonus. Accordingly, there could be no meeting of the minds and no contract for the amounts claimed.

To attempt to get around the fact that Karna knew he would not be paid the base salary and bonus he now claims he was due, Karna says his supervisors, McElhaney and Adams, promised Karna would be compensated in bonus or some other form "in lieu of" the base salary,

---

[81]   Elliott Aff't ¶ 4, Ex. A; Offer Letter (Sept. 11, 2009), Ex. A-2, BP 611-78.

[82]   Acceptance Email (Sept. 23, 2009), Ex. A-3, BP 679-81; Elliott Aff't ¶ 7-8, 10, , Ex. A; Karna Depo., Ex. B-1, p. 277, lines 17-21, p. 308, lines 4-8; Earnings Statement, Ex. A-4, BP 161; Earnings Statement, Ex. A-5, BP 160; Earnings Statement, Ex. A-7, BP CORPORATION 140; Earnings Statement, Ex. A-10, BP CORPORATION 130.

00219934.1

sign-on bonus, and VPP.[83]  This claim is without merit for many reasons, including the terms of the alleged contract are too vague and indefinite to constitute a valid contract as a matter of law. "[T]he terms of an oral contract must be clear, certain and definite."  *Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.—Corpus Christi 2004, no pet.) (affirming motion for summary judgment because amount of any potential bonus was indefinite at time of the alleged agreement); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("A contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook.").

Karna admits he has no evidence of any specific amount which would be paid or when it would be paid.[84]  Therefore, there was no valid and enforceable oral contract.[85]

## C.    Karna's FLSA Claims.

### 1.    The Allegations.

Karna claims that, throughout the time he worked for BP as a contractor and as an employee, he was a non-exempt employee entitled to overtime rates.[86]  He claims that prior to October 2009, BP failed to classify him as an employee under the FLSA and, after October 2009, BP misclassified him as exempt.[87]

### 2.    Karna's claim before May 2, 2009 is time-barred.

A cause of action for unpaid overtime under the FLSA "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action

---

[83]   Karna Depo., Ex. B-1, p. 308, lines 9-23, p. 310, lines 3-23, p. 315, line 2 to p. 317, line 17.
[84]   Karna Depo., Ex. B-1, p. 324, lines 6-15.
[85]   The evidence is undisputed that McElhaney told Karna that McElhaney intended to pursue a "spot bonus" for Karna, McElhaney did that, and Karna received the bonus.   McElhaney Depo., Ex. B-3, p. 127, lines 9-15, 21-24.
[86]   Pl.'s Am. Pet. ¶ 34-36.
[87]   Pl.'s Am. Pet. ¶ 18, 37-38.

accrued." 29 U.S.C. § 255(a).  It is the plaintiff's burden to show that an employer's violation was willful.  *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990).  Karna has no evidence of a willful violation.

Since Karna initially filed his lawsuit on May 2, 2011, Karna's claim before May 2, 2009 is time-barred.[88]  In the alternative, his claim before May 2, 2008 is time-barred.

### 3.   Karna's FLSA Claims Fail as a Matter of Law.

To prevail on a claim for unpaid overtime, Karna must prove: (1) the existence of an employment relationship; (2) that the employee was engaged in commerce or employed by an enterprise engaged in commerce; (3) that the defendants failed to pay the employee overtime required by the FLSA; and (4) that the employee is owed the amount claimed by a just and reasonable inference.  *See* 29 U.S.C. § 207(a); *see also Harvil v. Westward Comm., L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005); *Jones v. Willy, P.C.*, No. H-08-3404, 2010 WL 723632, at *3 (S.D. Tex. Mar. 1, 2010).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to prove that the employee falls within an exemption to the overtime requirement.  *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 636 (5th Cir. 2001).

Karna's claims fails because: (1) prior to October 2009, Karna was not a BP employee, but an independent contractor and, alternatively, he was exempt under the computer professional employee exemption; and (2) after October 2009, Karna was exempt under the highly compensated employee exemption.

---

[88]      Pl.'s Original Pet.

00219934.1

      a.      **August 2005-October 2009 Time Period.**

        *1)   Employee Status.*

To determine whether a person is an employee under the FLSA, the Fifth Circuit focuses on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he renders his services. *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998). The core inquiry is into whether the individual, as a matter of economic reality, is in business for himself. *Herman*, 161 F.3d at 303. The determination does not depend on isolated factors, but on the circumstances of the whole activity. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

The Fifth Circuit has articulated five factors to assist this analysis: (1) The degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and alleged employer; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Rutherford Food Corp.*, 331 U.S. at 730. No single factor is determinative. *Rutherford Food Corp.*, 331 U.S. at 730. Here, these factors, when considered in context, favor status as a contractor, not a BP employee.

The context is this. Karna had a contract with ISS, not BP; the contracts between Karna and ISS and ISS and BP specifically state Karna is not an employee of BP or ISS; and Karna was not paid by BP.[89] Karna used BP's computer to conduct his other business, could work from home, and had the ability (and did) do work for other companies.[90] While working at BP through Ideal, Karna did SAP consulting work for other companies, and taught training courses

---

[89]   Karna Depo., Ex. B-1, p. 60, lines 2-8, p. 61, lines 15-21, p. 238, lines 2-10; Deep Supplier Agreement, preamble & ¶¶ 2, 11, Ex. D-1, at IDEAL STAFFING 35-37; LSR Contract, preamble & ¶¶ 2, 11, Ex. D-2, at IDEAL STAFFING 6-8; RD Data Supplier Agreement, preamble & ¶¶ 2, 11, Ex. D-3, at IDEAL STAFFING 20-22; PSA §§ 3.1 & 3.5, Ex. D-4, at IDEAL STAFFING 51, 53-54.

[90]   *See, e.g.*, Karna Depo., Ex. B-1, p. 147, line 9 to p. 148, line 10, p. 258, lines 19-24, p. 270, lines 4-18, p. 272, line 2 to p. 273, line 24.

in BW.[91]   He also placed other independent contractors at BP and other companies, received referral fees, and entered into staffing contracts as a principal of RD Data Solutions.[92]   In addition, Karna received 1099's for his work and had the ability to take business deductions on his tax returns.[93]   This context, alone, indicates Karna was an independent contractor and not an employee of BP.

   ***Degree of Control.***   Karna was not given task-level direction; he was given a work program to do and he would manage it.[94]   His supervisors, Adams and McElhaney, would get involved if there was an issue or to make a major decision.[95]   Karna oversaw the building, delivery, support and enhancement for the WR5 Project based upon his expertise.

   ***The Extent of the Relative Investments of the Worker and Alleged Employer.***   BP paid Karna substantially for his expertise.   From 2006 to 2009, Ideal issued 1099's to Deep, LSR, and RD Data for the following amounts: $380,259.86 in 2006; $362,353.90 in 2007; $352,082 in 2008; and $294,392.04 in 2009.[96]   These payments far exceeded the amounts paid to Karna as an employee - a base salary of $125,000, a sign-on bonus of $10,000, and an 18% VPP.[97]

   ***Opportunity for Profit and Loss.***   Karna was paid by the hour for the time worked.

   ***Skill and Initiative Required.***   Everyone could not do Karna's job. It required special skill, training and expertise.   He was hired due to his expertise to be a program manager for WR5 system.[98]

---

[91]   *See, e.g.*, Karna Depo., Ex. B-1, p. 256, lines 9-20, p. 269, line 2 to p. 272, line 1; Resume (2009), Ex. C-2, at BP 102.

[92]   *See, e.g.*, Karna Depo., Ex. B-1, p. 147, line 9 to p. 148, line 10, p. 258, lines 19-24, p. 270, lines 4-18, p. 272, line 2 to p. 273, line 24.

[93]   Karna Depo., Ex. B-1, p.34, lines 5-6; p. 34, lines 13-14; p. 203, lines 2-6; p. 274, lines 22-24; p. 276, lines 5-7.

[94]   Adams Depo., Ex. B-2, p. 83, line 7 to p. 84, line 4, p. 84, line 18 to p. 86, line 10.

[95]   Adams Depo., Ex. B-2, p. 83, line 7 to p. 84, line 4, p. 84, line 18 to p. 86, line 10.

[96]   ISS 1099s, Ex. D-9, IDEAL STAFFING 544-48.

[97]   Pl.'s Am. Pet. ¶ 15.

[98]   Adams Depo., Ex. B-2, p. 74, line 14 to p. 75, line 20, p. 82, lines 1 to p. 844, line 2.

Even Karna describes himself as "datawarehousing expert" and "one of the most experienced consultants around BW/BPS arena since BW came in being."[99]  Karna was certified in SAP-BW (business warehouse reporting) and SAP-FI/CO (financial and controlling).[100]  As of March 2007, he had taught 55 classes in Business Warehouse ("BW"), Business Intelligence ("BI"), and SEM development condensed module.[101]  Prior to joining BP, Karna worked for 8 years on SAP and BW projects for various companies.[102]

*The Permanency of the Relationship.*  Karna was hired for the WR5 Project.[103]  His deliverable was the completion of that project to BP's satisfaction.[104]  He was not hired as an employee to fill a job position then existing at BP but, instead, to deliver a specific project.[105]

The undisputed evidence shows, as a matter of law, based upon the totality of the circumstances, that Karna was not an employee of BP between August 2005 and October 2009.

### 2)  *Karna falls within the Computer Professional Exemption.*

In addition to not qualifying as a BP employee, Karna falls within the computer professional exemption. Computer employees are eligible for exemption under Section 13(a)(17) of the FLSA if paid more than $27.63 an hour.  *See* 29 U.S.C. § 213 (a)(17); 29 C.F.R. § 541.400(a).  Karna received $147.50 per hour from August 2005 to March 2009 and $132.75 from March 2009 to October 2009, well over the minimum amount for the exemption. The question then becomes whether Karna's primary duties fall within the exemption.

This exemption applies to:

---

[99]  Karna Resume (2007), Ex. C-1, BP 57-65.
[100]  Karna Resume (2007), Ex. C-2, BP at 58, 65.
[101]  Karna Resume, Ex. C-1, BP at 59 (emphasis removed).
[102]  Karna Resume, Ex. C-1, BP at 59-64; Karna Depo., Ex. B-1, p. 16, line 15 to p. 33, line 1.
[103]  *See, e.g.,* Schedule A, Ex. D-10, IDEAL STAFFING 15.
[104]  *See, e.g.,* Schedule A, Ex. D-10, IDEAL STAFFING 15.
[105]  *See, e.g.,* Schedule A, Ex. D-10, IDEAL STAFFING 15.

19

> any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is--
>
> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

29 U.S.C. § 213(a)(17); 29 C.F.R. § 541.400(b).

The employee's "primary duty" must consist of one of the duties or a combination of duties listed in the statute. *See* 29 U.S.C. § 213(a)(17); 29 C.F.R. § 541.400(b). "Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The determination of an employee's primary duty "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

Karna's job responsibilities fell within the computer employee exemption. His job was to plan, schedule, and coordinate activities required to design, develop, build, enhance and support the WR5 System, a very sophisticated computer program.[106] In doing this, he reviewed technical and functional design specifications[107] and computer coding for the WR5 system, provided

---

[106]   Adams Aff't ¶ 9, Ex. C.

[107]   A "functional design" is the business terminology describing the business requirements that they are going to technically deliver. A "functional design review" involves talking to the business to make sure IBM understood what the business wanted in order to write the technical specifications. Adams Aff't ¶ 9 n.1, Ex. C.

feedback to the third party vendors (the developer), consulted with the users (the business) to understand its functional requirements, and then communicated that information to the WR5 developers.[108] Karna was then responsible for ensuring that the technical specifications prepared by the developers expressed the business's functional specifications and complied with BP internal standards.[109] He coordinated the testing of the WR5 system and performed testing.[110] He collaborated with users to determine necessary modifications.[111] Once the system was implemented, Karna responded to user inquiries, provided guidance, and participated in training users on WR5.[112] He then participated in the enhancement of the system.[113]

Karna's primary responsibilities consisted of one of the duties or a combination of duties listed in the statute and, as such, he was exempt from receipt of overtime.

### b.      Between October 2009 and March 2011, Karna was exempt from overtime as a highly compensated employee.

Between October 2009 and March 2011, Karna was a BP employee; however, he was not entitled to overtime under the FLSA because he was exempt under the highly compensated employee exemption. *See* 29 C.F.R. § 541.601. An employee is exempt if he (1) has a "total annual compensation of at least $100,000," which must include at least $455 per week on a salary or fee basis; and (2) "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(a) & (b)(1). Under the highly compensated employee exemption, the exempt duties or responsibilities do not have to be the employee's "primary duties." "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for

---

108   Adams Aff't ¶ 9, Ex. C.
109   Adams Aff't ¶ 9, Ex. C.
110   Adams Aff't ¶ 9, Ex. C.
111   Adams Aff't ¶ 9, Ex. C.
112   Adams Aff't ¶ 9, Ex. C.
113   Adams Aff't ¶ 9, Ex. C.

a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). Karna meets both requirements.

### Karna's total annual compensation exceeded $100,000.

Karna received a base salary of $125,000, a sign on bonus of $10,000, a VPP bonus of $23,438, and a spot bonus of $2,969.56. This is well over the $100,000 total annual compensation and $455 per week on a salary basis in the statute and is a strong indicator of Karna's exempt status. He meets the first requirement.

### Karna customarily and regularly performed exempt duties or responsibilities of an administrative employee.

The WR5/ER5 Application Support Manager job description accurately reflects the work Karna was responsible for.[114] As the WR5/ER5 Applications Support Manager, Karna coordinated all WR5 activities, including enhancements and project delivery, to ensure quality support services to the business.[115] Karna managed third party vendors; trained and supported business users; designed remediation actions to resolve gaps in compliance with BP's standards for Sarbanes Oxley; and coordinated with other application managers.[116] Karna also conducted technical and functional design reviews; reviewed computer coding for accuracy; oversaw testing; conducted testing; and identified solutions with the third party vendor.[117]

To meet the highly compensated employee exemption, however, Karna does not have to meet the primary duty test. Instead, he must only customarily and regularly perform any one or more of the exempt duties or responsibilities. He meets this requirement.

He also meets the requirements to be exempt as an administrative employee. An administrative employee performs "office or non-manual work directly related to the

---

[114] Adams Aff't ¶ 11, Ex. C.
[115] Adams Aff't ¶ 13, Ex. C.
[116] Adams Aff't ¶ 13, Ex. C.
[117] Adams Aff't ¶ 13, Ex. C.

00219934.1

management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(b). "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . computer network, internet and database administration . . . . Some of these activities may be performed by the employees who would qualify for another exemption." 29 C.F.R. § 541.201(b).

"Computer employees within the scope of [the computer employee] exemption, as well as those employees not within its scope, may also have executive and administrative duties which qualify the employees for exemption . . . . For example, systems analysts and computer programmers generally meet the duties requirements for the administrative exemption if their primary duty includes work such as planning, scheduling, and coordinating activities required to develop systems to solve complex business, scientific or engineering problems of the employer or the employer's customers." 29 C.F.R. § 541.402.

As set forth in detail above, Karna's job was to oversee the design, building, implementation and enhancement of a very sophisticated computer program. His job was exempt from overtime pay.

**D.    Negligent Misrepresentation, Fraudulent Misrepresentation, and Promissory Estoppel.**

**1.    The Allegations.**

Karna asserts claims for negligent misrepresentation, fraudulent misrepresentation, and promissory estoppel.[118]   Karna claims BP made the following representations: (1) if Karna

---

[118]       Pl.'s Am. Pet. ¶¶ 46-52, 53-58, 59-65.

became a salaried employee, his base pay would place him at the top of the company's G pay grade; (2) if Karna became a salaried employee, he would be compensated as much as he had been compensated when he worked on an hourly basis; and (3) Karna's position would be available to someone outside of BP.   Karna's claims for negligent misrepresentation and promissory estoppel are based on the first and second alleged representations only.   His claim for fraudulent misrepresentation is based on all three alleged representations.[119]

### 2. Karna's Claim for Negligent Misrepresentation and Fraud Fail as a Matter of Law.

The elements of a cause of action for negligent misrepresentation are: (1) a representation is made by a defendant in the course of business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered a pecuniary loss. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (*citing Federal Land Bank Ass'n v. Sloan*, 825 S.W.2d 439, 442 (Tex. 1991)).

To prove fraudulent misrepresentation, Karna must show: (1) a material misrepresentation; (2) that was either known to be false when made or asserted without knowledge of its truth; (3) which was intended to be acted upon; (4) which was relied upon, and (5) which caused injury. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).   Karna's claim for fraudulent misrepresentation

---

[119]   During his deposition, Karna asserted that McElhaney told him that he would get additional compensation "in lieu of" the higher base salary and sign-on bonus. Karna Depo., Ex. B-1, p. 308, lines 9-23, p. 310, lines 3-23, p. 315, line 2 to p. 317, line 17. Karna has not asserted a cause of action for negligent misrepresentation, fraudulent misrepresentation, or promissory estoppel based on that alleged statement. Such claims would fail as a matter of law. *See Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 559 (Tex. App. 1998) (promise not to terminate employee if he performed satisfactorily are too indefinite and not reasonably relied upon for a fraudulent misrepresentation and promissory estoppel).

fails because Karna has no evidence the statements were false representations of fact, that BP knew the statements were false, that Karna justifiably relied on the statements, or suffered any damages due to any justifiable reliance.

Karna's claims for negligent misrepresentation and fraud fail because none of the alleged statements constitute a misrepresentation of exiting fact; Karna has no evidence that he justifiably relied on the alleged statements, and Karna has no evidence of any damages suffered as a result of any reliance.

### a.    Karna has no evidence BP made a false statement of existing fact.

Karna fails to satisfy the first and second element—that BP made a false statement of existing fact.

The false information provided must be a misstatement of existing fact. *Allied Vista, Inc.*, 987 S.W.2d at 141; *Airborne Freight Corp. v. C.R. Lee Enters.*, 847 SW.2d 289, 298 (Tex. App.—El Paso 1992, writ denied). A conditional promise of future employment is not a statement of existing fact. *Manon v. Solis*, 142 S.W.3d 380, 388 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (holding that defendant's representations about plaintiff's terms of employment were not actionable because they related to future conduct.); *Allied Vista, Inc*, 987 S.W.2d at 141 (holding representations defendant would provide all equipment necessary to start Louisiana plant and would pay plaintiff $55,000 annually were promises of future conduct and not misrepresentations of existing fact).

According to Karna, the statements about salary were allegedly made during discussions about a job position Karna was applying for and had not yet been offered to him.[120]  A statement that BP would pay Karna a certain compensation if Karna should accept the position is not a

---

[120]    Karna Depo., Ex. B-1, p. 286, line 24 to p. 288, line 6.

00219934.1

statement of fact – it is contingent on Karna applying for the job, being selected for the job, being offered the job at a specific salary, and Karna accepting the job.

Karna also asserts BP misrepresented that the WR5/ER5 Application Support Manager job would be available to someone outside of BP in 2009. Karna has no evidence the job position was not offered to people outside to BP. In fact, the job was posted for persons outside of BP to apply, and Adams interviewed a number of candidates outside of BP.[121]

### b.    Karna has no evidence that he justifiably relied on the statements.

Karna has no evidence that he justifiably relied on the statements.

The undisputed evidence shows that before Karna accepted employment with BP as an employee, Karna had been given a written offer, which Karna, accepted, showing a salary of $125,000 a year, a sign on bonus of $10,000, and a VPP bonus of 18%. In the prior years as a contractor, Karna had made $380,259.86 in 2006; $362,353.90 in 2007; $352,082 in 2008; and $294,392.04 in 2009.[122] McElhaney told Karna that McElahney would seek a spot bonus, but the amount was not specified. Under the circumstances, Karna could not have justifiably relied on any alleged statement that, if Karna became a salaried employee, he would be compensated as much as he had been compensated when he worked on an hourly basis. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (In measuring justifiability, the Court inquires whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.").

Similarly, Karna could not have justifiably relied upon a statement that, if Karna became a salaried employee, his base pay would place him at the top of the company's G pay grade.

---

121    Interviews Email (July 9, 2009), Ex. C-3, BP 100.
122    ISS 1099s, Ex. D-9 IDEAL STAFFING 544-48.

26

Karna knew his base salary and bonus.  He could not have been justifiably misled about where he stood in the pay scale. Similarly, Karna cannot show any justifiable reliance on any statement that the WR5/ER5 Application Support Manager job would be available to someone outside of BP in 2009.

There is no evidence that Karna reasonably relied on any alleged misrepresentations.

### c.  Karna sustained no damages as a result of any alleged misrepresentations.

Inasmuch as BP made no misrepresentations of existing fact upon which Karna justifiably relied, Karna could not have sustained any damages as a result of any reliance on such statements.

### 3.  Karna's Promissory Estoppel Claim Fails as a Matter of Law.

### a.  The Allegations.

Karna's promissory estoppel claims are based upon the same alleged misrepresentations as his fraud and negligent misrepresentation claims; specifically, that BP made the following representations: (1) if Karna became a salaried employee, his base pay would place him at the top of the company's G pay grade; (2) if Karna became a salaried employee, he would be compensated as much as he had been compensated when he worked on an hourly basis.

To prove promissory estoppel, Karna must prove: (1) a promise; (2) foreseeability by the promisor that the promisee would rely on the promise; and (3) substantial reliance by the promisee to his detriment.  *Gilmartin v. KVTV-Channel 13*, 985 S.W.2d 553, 559 (Tex. App.—San Antonio 1998, no pet.).

First, the statements alleged were not promises.  *See Gilmartin*, 985 S.W.2d at 558-59 (statement that employment would be renewed from year to year was not definite enough to support claim for promissory estoppel).

27

Second, for the reasons set forth above, the alleged promises could not have been justifiably relied upon as a matter of law.   *See, e.g., Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (promise to supply surplus equipment too indefinite to be reasonably relied on as a matter of law).

Third, inasmuch as BP made no promises upon which Karna justifiably relied, Karna could not have sustained any damages as a result of any reliance on such promises.

### E.   Unlawful Employment Practices.

#### 1.   The Allegations.

Karna claims that BP demanded Karna engage in "improper and/or illegal activities" relating to compliance with Sarbanes-Oxley Act, regulations promulgated by the Federal Energy Regulatory Commission and "other laws or regulations"; that BP verbally reprimanded Karna when he complained about the illegal acts; BP improperly lowered his job performance rating in apparent retaliation against him, and BP made conditions so intolerable for Karna that he had no alternative but to resign his employment.[123]

#### 2.   Karna's Unlawful Employment Claim Fails as a Matter of Law.

Based on the petition, it appears that Karna is asserting a *Sabine Pilot* claim, an exception to the employment-at-will doctrine. *See Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex. 1985). Texas is an employment-at-will state, meaning that an employer may terminate its employee at any time for any reason. *Federal Exp. Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993). "Under this 'at will' rule, the employer may, without liability, discharge the employee for a good reason, a bad reason, or no reason at all." *Phillips v. Goodyear Tire & Rubber Co.*, 651 F.2d 1051, 1054 (5th Cir. 1981). The Texas Supreme Court has created one

---

123     Pl.'s Am. Pet. ¶¶ 20, 22, 67.

narrow exception to that doctrine for "the discharge of an employee for the sole reason that the employee refused to perform an illegal act." *Sabine Pilot Service, Inc.*, 687 S.W.2d at 735.

To establish a *prima facie* case of wrongful termination under *Sabine Pilot,* the plaintiff must prove that: (1) he was required to commit an illegal act which carries criminal penalties; (2) he refused to engage in the illegality; (3) he was discharged; (4) the sole reason for his discharge was his refusal to commit an unlawful act. *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003) (*citing Sabine Pilot Service, Inc.*, 687 S.W.2d at 735). Karna's claim fails because he has provided no evidence that he was asked to perform an illegal act which carries criminal penalties, that he was constructively discharged, or that the sole reason for his discharge was his refusal to commit an unlawful act.

### a.      Karna has no evidence he was required to perform an illegal act which carries criminal penalties.

Karna has no evidence he was required to commit an illegal act which required criminal penalties.

### b.      Karna has no evidence he was constructively discharged.

Karna asserts (1) he was verbally reprimanded when he complained of illegal acts, (2) BP improperly lowered Karna's performance rating, and (3) BP made conditions so intolerable Karna had to resign. The first two will not support a constructive discharge claim as a matter of law. There is no evidence to support the third claim.

Karna's vague and conclusory allegation of being reprimanded for complaining of illegal acts is not enough. *See Hammond v. Katy Indep. Sch. Dist.,* 821 S.W.2d 174, 178 (Tex. App.— Houston [14th Dist.] 1991, no writ) (being "called on the carpet and chewed out" and general "harassment" is not enough to constitute constructive discharge).

Karna's change in performance rating from "exceptional" to "exceeds" is insufficient to raise a fact issue. An employee's low appraisal on a performance evaluation does not support a constructive discharge allegation. *See Junior v. Texaco, Inc.*, 688 F.2d 377, 380 (5th Cir. 1982).

Finally, there is no evidence BP made conditions so intolerable Karna had to resign. An employee is constructively discharged when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Hammond*, 821 S.W.2d at 177. To find a constructive discharge, a court must determine whether a reasonable person in the employee's position would have felt compelled to resign. *Hammond*, 821 S.W.2d at 177.

On February 22, 2011, Karna sent an email to John Ray, copying Tonya Elliot (HR) and Daphne Adams, stating that Karna was resigning from his employment.[124] Karna stated, "I love what I was doing but I need to move on. I will try to transition as smoothly as possible. Thanks so much."[125]

Nothing in this email suggests a reasonable person in the Karna's position would have felt compelled to resign. Additionally, there is no evidence that suggests a reasonable person in the Karna's position would have felt compelled to resign.

      **c.**      **Karna has no evidence that the sole reason for his resignation was a refusal to perform an illegal act.**

There is no evidence that the sole reason for Karna's resignation was the refusal to perform an illegal act.

## VII.   PRAYER

BP Corporation North America, Inc. respectfully requests the Court (1) grant this motion for summary judgment, (2) dismiss all of plaintiff's claims against BP Corporation North

---

[124] Resignation Email (Feb. 22, 2011), Ex. A-9, BP 198.
[125] Resignation Email, Ex. A-9, BP 198.

00219934.1

America, Inc. with prejudice, and (3) grant BP Corporation North America, Inc. such other and further relief as BP Corporation North America, Inc. is entitled to receive.

Respectfully submitted,

_/s/ Richard A. Schwartz_
Richard A. Schwartz (TBN 17869450)
Ruth Karper (TBN 24052272)
Schwartz, Junell, Greenberg & Oathout, LLP
909 Fannin, Suite 2700
Houston, TX 77010
Telephone: (713) 752-0017
Telefax: (713) 752-0327
Email: dschwartz@sjgolaw.com

Attorneys for Defendant,
BP Corporation North America, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 29th day of January 2013, I electronically filed _BP Corporation North America, Inc.'s Amended Motion for Summary Judgment_ with the Clerk of Court using the CM/ECF system. Copies of the filing will be sent by CM/ECF notification to the following:

J. Chris Juravich
2500 City West Blvd., Ste. 300
Houston TX 77042

_/s/ Ruth Karper_
Ruth Karper

31