## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| VINAY K. KARNA, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-12-0101 |
| | § | |
| BP CORPORATION NORTH | § | |
| AMERICA, INC., | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

The Court has before it three dispositive motions.  They are Defendant BP Corporation

North America Inc.'s ("BP" or "Defendant") Motion for Summary Judgment (Doc. No. 17) and

Amended Motion for Summary Judgment ("Def.'s Mot.") (Doc. No. 45)[1], and Plaintiff Vinay K.

Karna's ("Karna" or "Plaintiff") Motion for Partial Summary Judgment ("Pl.'s Mot.") (Doc. No.

11).  After considering the Motions, all responses thereto, and the applicable law, the Court

concludes that Plaintiff's Motion for Partial Summary Judgment should be **GRANTED IN**

**PART AND DENIED IN PART**, and Defendant's Motion for Summary Judgment and

Amended Motion for Summary Judgment should be **GRANTED IN PART AND DENIED IN**

**PART**.

## I.      BACKGROUND

This suit is brought by a former employee against his former employer.  Karna alleges

violations of the Fair Labor Standards Act ("FLSA"), breach of contract, quantum meruit,

---

[1] BP filed an Amended Motion for Summary Judgment correcting typographical errors in its original Motion for
Summary Judgment (Doc. No. 17).  (*See* Doc. No. 34, Mot. for Leave, at 1.)  The Amended Motion for Summary
Judgment contains no substantive changes.  (*Id.*)

negligent misrepresentation, fraudulent misrepresentation, promissory estoppel and wrongful discharge by BP.  (*See generally* Doc. No. 1, Ex. A-2G, Pl.'s First Am. Pet.)

Karna has worked extensively in the SAP Business Warehouse ("BW") arena.  (Def.'s Mot., Ex. C-1, Karna's 2007 Resume; Def.'s Mot., Ex. C-2, Karna's 2009 Resume.)  SAP is a provider of data management systems used by many large companies.  (Def.'s Mot., Ex. C, Daphne Adams Aff. ¶ 4.)  BW is SAP's data warehouse program.  (*Id.*)  Prior to being hired by BP, Karna had spent four years working as a SAP BW independent contractor for a number of different companies.  (Karna's 2007 Resume; Def.'s Mot., Ex. B-1, Karna Dep. 23:2–33:1.)  Before that, he was employed as a manager at Ernst & Young for four years, during which time he worked primarily as a SAP BW consultant for a number of Ernst & Young's clients.  (Karna's 2007 Resume; Def.'s Mot., Ex. B-1, Karna Dep. 16:12–22:8.)

Karna first began working at BP in August 2005.  (Doc. No. 17, Def.'s Mot., Ex. D-1, August 2005 Supplier Agreement between Deep Consulting ("Deep") and Ideal Staffing Services ("Ideal"); Def.'s Mot., Ex. B-1, Karna Dep. 33:4–5.)  Parties disagree about how this relationship came about.  Karna contends BP contacted him directly, through an employee named Satish Chalasani, seeking to hire him, and that he was hired as an hourly employee. (Def.'s Mot., Ex. B-1, Karna Dep. 33:6–34:12.)  Karna contends that Ideal was just the third-party payroll service that BP decided to use to pay Karna.  (*Id.*; Doc. No. 35, Pl.'s Resp. to Def.'s Mot., Ex. A, Karna Aff. ¶ 9.)  BP contends that Karna was hired as an independent contractor, as evidenced by Karna's[2] agreement with Ideal and BP's agreement with Ideal.  (Def.'s Mot., at 2–

---

[2] The initial agreement with Ideal covering Karna's work at BP was actually an agreement between Ideal and Deep. (August 2005 Supplier Agreement between Deep Consulting and Ideal Staffing Services.)  Karna at one point owned Deep, as well as a number of other consulting companies which entered into agreements with Ideal to cover Karna's work at BP.  (Karna Dep. 35:9–12; 41:4–21; Def.'s Mot., Exs. D-1, D-2, D-3, Supplier Agreements with Ideal.)  His wife, a co-owner of Deep, actually executed a number of the agreements between Deep and Ideal. (Karna Dep. 41:4–21; Def.'s Mot., Exs. D-1, D-2, Supplier Agreements with Ideal.)

3; August 2005 Supplier Agreement between Deep and Ideal; Def.'s Mot, Ex. D-4, Professional Services Agreement.)  BP points out that Karna's agreement with Ideal specifically provides that Karna is not an employee of Ideal's client, BP.  (August 2005 Supplier Agreement between Deep and Ideal ¶ 2.)   There are a number of Supplier Agreements covering Karna's work at BP through October 2009.  (Def.'s Mot., Exs. D-1, D-2, D-3, Supplier Agreements between Ideal and Karna.)  BP paid Ideal $157.50 per hour; in turn, between August 2005 and October 2009, Ideal paid Karna between $147.50 and $132.75 per hour.  (Def.'s Mot., Ex. B-1, Karna Dep. 80:16–24; 81:22–82:13, 133:16–134:7; Def.'s Mot, Ex. D-8, March 10, 2009 RD Data Invoice.)

Karna was originally hired to perform "Data Warehousing with SAP's Business Warehouse."  (August 2005 Supplier Agreement between Deep and Ideal, Ex. A, Assignment Confirmation Form.)   Both BP and Karna describe his original role as a BW Coordinator. (Def.'s Mot., at 4; Karna's 2007 Resume.)  Karna's duties before May 2, 2008 are not relevant to this lawsuit.  (Pl.'s Mot., at 4.)  From May 2, 2008 through October 18, 2009, Karna remained a BW Coordinator for BP.  (*See* Def.'s Mot., at 4; Karna's 2009 Resume; Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 17–18.)  However, parties disagree about Karna's duties and his level of responsibility from May 2, 2008 through October 19, 2009.

BP states that, in 2007 and 2008, Karna "coordinated enhancements, continuous improvement in the system and processes, and correcting issues in the system arising from incorrect logic and functionality rule changes ('break/fix activities') of the WR5 system with [the] third party vendor."  (Def.'s Mot., Ex. C, Daphne Adams Aff. ¶ 7.)[3]  From late 2008 to October 2009, BP provides that Karna "worked on migrating from BP's legacy BW system to

---

[3] The BW system BP uses to access and review financial data is WR5; WR5 contains various reports that present financial information in a user-friendly way.  (Adams Aff. ¶¶ 3–4; Doc. No. 11, Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 9, 12.)  WR5 was phased in to replace a predecessor application, EPDW, and went "live" around May 2006.  (Pl.'s Mot., Ex. A, Karna Aff. ¶ 14; Def.'s Mot., Ex. B; Adams Dep. 79:4–6.)

WR5 along with continued coordination activities of WR5 enhancements and break/fix activities." (*Id.* ¶ 8.)   Daphne Adams, Karna's supervisor throughout this time, described Karna's job as follows:

> Karna's job was to plan, schedule, and coordinate activities required to design, develop, build, enhance and support the WR5 System, a very sophisticated computer program.  In doing this, he reviewed technical and functional design specifications and computer coding for the WR5 system, provided feedback to the third party vendors (the developer), consulted with the users (the business) to understand its functional requirements, and then communicated that information to the WR5 developers.  Karna was then responsible for ensuring that the technical specifications prepared by the developers expressed the business's functional specifications and complied with BP internal standards.  He coordinated the testing of the WR5 system and performed testing.  He collaborated with users to determine necessary modifications.  Once the system was implemented, Karna responded to user inquiries, provided guidance, and participated in training users on WR5. He then participated in the enhancement of the system.

(Def.'s Mot., Ex. C, Adams Aff. ¶ 9.)   BP contends that, throughout his time as SAP BW Coordinator, Karna was not given task-level directions, but was given a project to manage; managers at BP would become involved only to resolve any issues or provide redirection. (Def.'s Mot., at 5; Def.'s Mot., Ex. B-2, Adams Dep. 82:12–83:25.)

Karna describes his duties throughout this time period differently.  He represents that, at the pertinent time, from May 2, 2008 through March 4, 2011, his primary duty was to assist his supervisor, Adams, with WR5.  (Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 7–8.)  He states that his own responsibilities included maintaining various lists for Adams, acting on any immediate instructions from Adams, obtaining approval from Adams or Adam's supervisor on various decisions, performing scheduling tasks for Adams, creating problem tickets with third parties on behalf of Adams, and making sure problem tickets were resolved.    (*Id.* ¶ 8.)  Karna also represents that Adams gave him substantial and constant direction as to his responsibilities. (Doc. No. 35, Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. A, Karna Aff. ¶¶ 35–43.)  Karna

contends that he did not "coordinate enhancements, continuous improvement in the system and processes, [or] correct[] issues with the [WR5] system" because, in fact, IBM, a third party, performed those tasks.  (*Id.* ¶ 32; Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 25–28.)  According to Karna, IBM was responsible for managing WR5; IBM made all decisions about what to build, and how to solve particular problems.  (Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 25, 27; Pl.'s Resp., Ex. A, Karna Aff. ¶ 46.)  Indeed, Karna states that under IBM's contract with BP, only IBM was allowed to decide how to fix any problems with WR5; Karna could advise IBM only that a particular problem existed, but IBM was the sole party allowed to write code that would resolve that problem.  (Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 32–35.)

Karna alleges that, throughout his time as BW Coordinator at BP, he was repeatedly prevented from billing all of the hours he worked.  (Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 76–79.)  Karna states that Adams repeatedly told him not to report more than forty-five to fifty hours per week.  (*Id.* ¶ 76.)  Karna also, at one point, informed Adams that BP's billing system, Elance, actually did not allow individuals to enter more than fifty hours per week.  (*Id.* ¶ 79; Pl.'s Mot., Ex. F, Adams Dep. 172:12–173:25.)  Adams did not look into the problem, instead advising Karna simply to bill any excess hours the following week.  (Pl.'s Mot., Ex. F, Adams Dep. 173:5–25.)  Karna also alleges that BP knew that he was not being paid for all of the hours worked, not only because he told Adams, but because he input significantly different hours into Project Server, a project tracking system that individuals in the Enterprise Systems department were required to use beginning in March 2009.  (Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 76–79; Pl.'s Resp., Ex. A, Karna Aff., Exs. 12, 13, Elance and Project Server Records; Def.'s Mot., Ex. B-3, McElhaney Dep. 117:9–118:23.)  Karna further alleges that there existed a trend at BP of

"burying time" and a sense among employees that those who bill overtime hours are perceived as inefficient. (Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 77–78; June 26, 2009 Slides from Meeting, at 4.)

During his time as a BW coordinator for BP, Karna was also engaged in a few other enterprises, though parties dispute whether these activities are relevant. (*Compare* Doc. No. 39, Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., at 7–8 *with* Doc. No. 36, Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J., at 3–6.) For instance, in March 2008, he performed somewhere between fifteen and twenty hours of BW consulting work for Champion Technologies during "off hours." (Def.'s Mot., Ex. B-1, Karna Dep. 270:25–272:1.) Although Karna's contract with Champion Technologies contract indicated a rate of $150 per hour, Karna states that he was never paid for this work. (Def.'s Mot., Ex. B-1, Karna Dep. 271:6–272:1; Pl.'s Resp., Ex. A, Karna Aff. ¶ 21.) Karna also states that, from May 2, 2008 through October 19, 2009, he did not perform any consulting work for other companies. (Pl.'s Resp., Ex. A, Karna Aff. ¶ 21.) BP also points out that Karna received referral fees from RD Data Solutions, a company that had previously placed Karna with other companies that needed BW contract work. (Def.'s Mot., Ex. B-1, Karna Dep. 38:11–40:15, 256:19–24; Def.'s Resp., Ex. E-1, Karna Dep. 146:3–148:22.) Karna states that, from 2005 to 2011, he received a total of four referral fees. (Pl.'s Resp., Ex. A, Karna Aff. ¶ 23.) He also stated at his deposition that the referral fees from RD Data Solutions were about $5.00 or $10.00. (Def.'s Resp., Ex. E-1, Karna Dep. 147:24–148:1.) Karna also taught BW classes approximately twelve weekends a year between 2008 through 2010, though it is not clear what income, if any, he received from teaching. (Pl.'s Resp., Ex. A, Karna Aff. ¶ 24; Def.'s Resp., Ex. E-1, Karna Dep. 256:4–20.) Finally, Karna's tax returns for 2008 and 2009 contain significantly different income numbers than what Karna received from Ideal for his work at BP. (*Compare* Def.'s Mot., Ex. D-9, Ideal Form 1099s, at 4–

5 *with* Def.'s Resp., Exs. E-4, E-5 2008 and 2009 Form 1040s.)  The Court cannot posit, from the evidence before it, a comprehensive explanation for the divergent income numbers; however, at least some of the difference can be explained by the Karnas' real estate losses.  (*See generally* Def.'s Resp., Exs. E-4, E-5, 2008 and 2009 Form 1040s.)

Karna states that, starting in 2007, James David McElhaney, Adams' direct supervisor, and Adams both began approaching Karna about becoming a salaried employee of BP.  (Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 60–62.)   Karna asserts that both Adams and McElhaney told him repeatedly that, if he did not agree to become a salaried employee, BP would replace him with a salaried employee.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 64; Def.'s Mot., Ex. B-1, Karna Dep. 280:7–20.)  Karna eventually did apply, and receive an offer, for the position of WR5/ER5 Applications Support Manager, a salaried position at BP.  (Def.'s Mot., Ex. C-2, Karna 2009 Resume; Def.'s Mot., Ex. C-3, July 9, 2009 email from Adams; Def.'s Mot., 22, Ex. A-2, Karna offer email.)

It appears from the record that Karna's compensation as the WR5/ER5 Applications Support Manager was a recurring topic at BP.  Karna represents that, before he accepted the position, McElhaney assured him that he would be compensated at the high end of pay grade G. (Pl.'s Resp., Ex. A, Karna Aff. ¶ 65.)  He also represents that Adams told him his compensation as a salaried employee would be comparable to what he had been receiving in his hourly position.  (Def.'s Mot., Ex. B-1, Karna Dep. 280:7–20, 283:2–16.)

Karna also alleges a meeting took place on July 29, 2009 where Karna, McElhaney, and Adams were present and Karna was offered a certain compensation package if he were to become a salaried employee.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 90.)  Karna alleges that McElhaney said that BP would offer a base salary of $140,000, a sign-on bonus of $40,000, and

a high-end Variable Payment Program ("VPP") bonus.[4]   (*Id.*)  Adams allegedly clarified that the VPP would be 30%.  (*Id.*)   Karna understood this conversation to constitute an offer of employment, and "accepted the offer on the spot."   (*Id.*)   He alleges he accepted this offer because of representations by McElhaney and Adams that, if he did not become a salaried employee, BP would replace him.   (*Id.*)   He denies ever agreeing to any other terms of employment than those offered in the July 29, 2009 meeting.  (*Id.*)

Despite these alleged representations about compensation, McElhaney ultimately was able to secure a $125,000 base salary; this salary is approximately in the middle of pay grade G, and toward the high end of what any pay grade G employee actually received.  (Def.'s Mot., Ex. A-1, July – August 2009 emails between McElhaney and BP's Resourcing Advisor for Corporate Functions (indicating that McElhaney requested a base salary of $125,000 for Karna, when the lowest paid Grade G employee received $103,700 and the highest grade G employee received $129,830); Def.'s Mot., Ex. A-12, Base Salary Chart (indicating that grade G ranges from $87,000 to $162,000).)   McElhaney also sought to obtain approval for a sign-on bonus of $25,000, but only received approval for $10,000.   (July – August 2009 emails between McElhaney and BP's Resourcing Advisor for Corporate Functions.)  McElhaney represents that he advised Karna of these numbers about a week before a final offer letter was issued.  (Def.'s Mot., Ex. B-3, McElhaney Dep. 104:3–21.)  On September 11, 2009, Karna received an offer letter from McElhaney disclosing this base salary and signing bonus.  (Def.'s Mot., Ex. A-2, September 11, 2009 email enclosing September 10, 2009 offer letter from McElhaney to Karna.)

Karna was displeased with this base salary but had allegedly been assured by McElhaney, sometime around September or October of 2009, that he would be further compensated in the

---

[4] VPP is BP's annual bonus plan.  (Def.'s Mot., Ex. A-2, September 10, 2009 Offer letter from McElhaney to Karna.)  BP has several bonus plans. *See infra* Part I, n.5.

form of bonuses.  (Def.'s Mot., Ex. B-1, Karna Dep. 308:9–23, 313:16–315:25, 324:4–15.)  On

September 23, 2009, Karna responded to the email enclosing his offer letter, stating only, "I

accept."   (Def.'s Mot., Ex. A-3, September 2009 emails between Karna and BP Human

Resources regarding new position.)  On October 18, 2009, Karna officially assumed the title of

WR5/ER5 Applications Support Manager at BP.  (Def.'s Mot., Ex. A, Tonya L. Elliot Aff. ¶ 6.)

       Karna did subsequently receive the aforementioned sign-on bonus of $10,000.  (Def.'s

Mot., Ex. A-4, October 19, 2009 – October 31, 2009 pay stub.)  Karna also ultimately received

an $23,438 as part of BP's VPP and a subsequent additional spot bonus of $2,969.56, awarded

based on McElhaney's recommendation.  (Def.'s Mot., Ex. B-1, Karna Dep. 336: 21–23; Def.'s

Mot., Ex. A-6, April 20, 2010 email from McElhaney to Human Resources; Def.'s Mot., Ex. A-

4, June 1, 2010 – June 15, 2010 pay stub.)[5]

       The job posting for the WR5/ER5 Applications Support Manager position indicated that

Karna would be "responsible to deliver daily Business Warehouse/Management Information

("BW/MI") application support management and analysis services, ensuring timely response and

resolution to support requests of . . . WR5/ER5."  (Def.'s Mot., Ex. A-8, June 15, 2009 Job

Posting.)  BP contends Karna did just that during his time as WR5/ER5 Applications Support

Manager.  (Def.'s Mot., at 8.)  Adams, who remained Karna's supervisor, stated that, as the

WR5/ER5 Applications Support Manager, Karna coordinated all WR5 activities, including

enhancements and project delivery, to ensure quality support services to the business;  managed

third party vendors;  trained and supported business users;  designed remediation actions to

---

[5] BP has several bonus programs.  As noted previously, VPP is the annual bonus plan, which is based on individual
and business performance.  (Def.'s Mot., Ex. A-2, September 10, 2009 Offer letter from McElhaney to Karna.)  At
target, a pay grade G employee would receive a 15% VPP bonus, or $18,750.  (*Id.*; Def.'s Mot., Ex. A-2, Total
Rewards Statement.)  Karna exceeded his target VPP bonus.  (*Compare* Def.'s Mot., Ex. A-2, Total Rewards
Statement *with* Karna Dep. 336: 21–23.)  A spot bonus is a reward for team or individual performance that exceeds
expectations.  (Total Rewards Statement.)  It can come at any point throughout the year.  (*Id.*)

resolve gaps in compliance with BP's standards for the Sarbanes-Oxley Act; and coordinated with other application managers; conducted technical and functional design reviews; reviewed computer coding for accuracy; oversaw testing; conducted testing; and identified solutions with the third party vendor.  (Def.'s Mot., Ex. C., Adams Aff. ¶13.)  McElhaney states that Karna supported several Management Information projects, which were adding scope onto the uses of WR5, ensured those projects did not disrupt or negatively impact the existing operations, and transitioned the projects from implementation into support.  (Def.'s Mot., Ex. B-3, McElhaney Dep. 24:9–17.)

Karna contends that his new title did not change his responsibilities.  (Pl.'s Resp., at 14–17.)  He states that both Adams and McElhaney repeatedly told him, before he accepted the position, that he would be doing the same work he had been doing all along.  (Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 60–62.)  He points out that he was never made the control evaluation template ("CET")[6] owner of WR5; rather, throughout Karna's time at BP, Adams remained the CET owner for WR5.  (*Id.* ¶¶ 67–68.)  He also points out that he was not on the distribution email list of BP application managers, and, on at least one occasion, he was not informed of important upgrades to WR5 until another employee forwarded the information to him much later.  (*Id.* ¶¶ 69–70; Pl.'s Resp., Ex. A-10 February 3, 2011 email to BP application managers distribution list; Pl.'s Resp., Ex. A-11 January 2011 emails about updates to WR5.)  He asserts that he did not coordinate "all WR5 activities, including enhancements and project delivery, to ensure quality support services to the business."  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 71 (quoting Def.'s Mot., at 8).)  He denies managing third party vendors, stating that third party vendors had their own managers who managed their employees.  (*Id.* ¶ 72.)  He also denies any changes to his duties to

---

[6] A CET is a document that establishes the measures BP must take to comply with the Sarbanes-Oxley Act.  (Pl.'s Resp., Karna Aff. ¶ 67.)

train and support business users.  (*Id.* ¶ 73.)   He states that he did not conduct technical and functional design reviews, review computer coding for accuracy, oversee or conduct testing, or identify solutions with the third party vendors.  (*Id.* ¶ 74.)  Finally, he represents that he had no authority to design "remediation actions to resolve gaps in compliance with BP's standards for Sarbanes Oxley."  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 75 (quoting Def.'s Mot., at 8).)

In April 2010, McElhaney retired.  (Pl.'s Resp., Ex. B. Karna Aff. ¶ 4.)  McElhaney was replaced by John Ray.  (*Id.*)  On or about October 12 or 13, 2010, Ray asked Karna to provide anonymous IDs for individuals to access WR5.  (*Id.* ¶ 13.)  Karna explains that, because WR5 contains sensitive financial system, it is subject to internal controls as specified in the Sarbanes-Oxley Act.  (*Id.* ¶ 14.)  In particular, records of individuals who have access to such data must be kept, their activities must be logged, and documentation about the internal controls on WR5 must be maintained and provided to auditors.  (*Id.*)  Karna told Ray that he could not legally provide anonymous IDs.  (*Id.* ¶ 15.)  Ray then allegedly instructed Karna to create a ticket to allow the distribution of anonymous IDs, and to conceal the ticket and any other document related to the creation of anonymous IDs.  (*Id.*)  After Karna refused, Ray sent an email requesting input from a number of other individuals.  (*Id.* ¶ 17; Pl.'s Resp., Ex. B. Karna Aff., Ex. 1 October 2010 emails about anonymous IDs.)  At least one compliance employee, Mark Hutton, was opposed to providing anonymous IDs;  BP points out that another compliance employee found it an appropriate temporary measure.  (Pl.'s Resp., Ex. B. Karna Aff., Ex. 1 October 2010 emails about anonymous IDs; Pl.'s Resp., Ex. B. Karna Aff. ¶ 17; Doc. No. 47, Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 1 n.1.)  Karna believes that BP ultimately did not supply anonymous IDs.  (Pl.'s Resp., Ex. B. Karna Aff. ¶ 18.)

Karna contends that because of his refusal to provide anonymous IDs, Ray began to treat him in an increasingly hostile manner.  (*See id.* ¶¶ 19–23.)  Specifically, he indicated that Ray would respond to him with "unwarranted sarcasm," Ray refused to delegate to him any financial authority or to name him CET owner of WR5, Ray refused to allow him to use vacation time that he was previously told he could carry over to the following year, and Ray withheld information from him regarding WR5.  (*Id.*)  Karna also identifies a number of subsequent incidents in late 2010 and early 2011 when Ray and Adams asked him to engage in allegedly illegal activities. (*See id.* ¶¶ 24–29.)

Karna states that, by mid-February 2010, he began to feel as though BP was attempting to force him out of the company, and he found himself constantly worrying about "what BP would ask me to do next."  (*Id.* ¶ 30.)  Believing that he could not do anything to salvage his job, Karna officially resigned on February 22, 2011.  (*Id.* ¶¶ 33–34.)

BP has now filed a Motion for Summary Judgment on all of Karna's claims.  (*See generally* Def.'s Mot.)  Karna has filed a Motion for Partial Summary Judgment, seeking a determination that Karna was an employee under the FLSA before October 19, 2009, and that, throughout the relevant time period, Karna was not an exempt employee under 29 U.S.C. § 213(a)(17), which covers certain employees who work as computer systems analysts, computer programmers, software engineers, or other similarly skilled workers.  The Court will first address both parties' arguments as to Karna's FLSA claim.  The Court will then address the remainder of BP's Motion for Summary Judgment.

## II.    LEGAL STANDARD

To grant summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant is therefore entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56.  The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  *Id.*  If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial.  *Id.*  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted) (internal quotation marks omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party."  *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007).  Courts may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Liquid Air Corp.*, 37 F.3d at 1075 (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Liquid Air Corp.*, 37 F.3d at 1076 (citation omitted) (internal quotation marks omitted).  A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts.  *Id.* at 1075.

13

III.    ANALYSIS

   A.    FLSA

"The FLSA requires covered employers to pay nonexempt employees at not less than the minimum wage and at one and one-half times their regular rate for all hours worked in excess of forty (40) during a workweek." *Floridia v. DLT 3 Girls, Inc.*, No. 4:11–cv–3624, 2013 WL 127448, at *2 (S.D. Tex. Jan. 9, 2013) (citing 29 U.S.C. §§ 206(a)(1), 207(a)(1)).   Section 216 provides a right of action for employees against employers who violate §§ 206 and 207. Here, Karna alleges that BP failed to pay him overtime wages for hours worked above forty between May 2, 2008 and October 19, 2009, in violation of 29 U.S.C. § 207.  (Doc. No. 1., Ex. A-2G, Pl.'s First Am. Pet. ¶¶ 34–45.)

### 1.    Employee or Independent Contractor

The FLSA includes an expansive definition of who qualifies as an employee. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, (1992) (The FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (citations omitted).  To determine if an individual is an employee under the FLSA, the Fifth Circuit considers whether, "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998)).  As part of this inquiry, courts are to consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the

job; and (5) the permanency of the relationship.  *Id.*  No single factor is determinative.  *Id.* (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–44 (5th Cir. 1987)).

Plaintiff contends that between May 2, 2008 and October 19, 2009, Karna was an employee of BP.  (Pl.'s Mot., at 10–19.)  BP contends that Karna was an independent contractor during that time priod.  (Def.'s Resp., at 3–14.)  BP does not dispute that Karna was an employee from October 19, 2009, until February 22, 2011.  (*See* Def.'s Mot., at 17–23.)  Both parties move for summary judgment on Karna's status between May 2, 2008 and October 19, 2009.

### a.  Degree of Control

Degree of control refers to whether the plaintiff possesses "real independence" in the economic relationship.  *See Hopkins*, 545 F.3d at 343.  As the Fifth Circuit has made clear, "[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity."  *Id.* (citing *Brock*, 814 F.2d at 1049).  "[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence."  *Id.*

Here, there are no facts to suggest that Karna exerted such a degree of control as to constitute a separate economic entity.   For instance, there is no indication that Karna could control how much work he did for BP in a given week.  The record suggests that, although Karna and Adams would discuss how many hours he typically worked, Karna was expected to work the number of hours BP needed.  (*See* Def.'s Reply, Ex. E-2, Adams Dep., 161:11–23 ("There are some days you may not even work eight hours.  Some days you may have to work 10 hours.")); *see Herman*, 161 F.3d at 303 (finding that degree of control factor pointed to independent contractor status where plaintiff drivers were on call and could accept or deny a prospective job, in contrast with other drivers who had to show up at a specific time and were prohibited from

turning down a job).  Similarly, there is no suggestion that Karna controlled any "meaningful economic aspects" of the business.  *See Hopkins*, 545 F.3d at 343–44 (finding control factor weighed in favor of employee status where sales leaders could not control personnel issues, advertising, the type or price of products they sold, or the number of sales leads they would receive); *Chapman v. A.S.U.I. Healthcare of Tex., Inc*, No. H–11–3025, 2012 WL 3614187, at *4 (S.D. Tex. Aug. 21, 2012) (finding control factor weighed in favor of employee status where defendant controlled all meaningful aspects of the home healthcare business, such as selecting clients, selecting residences, and hiring staff, and plaintiffs, the care providers, were simply assigned to houses and shifts); *Martin v. Priba Corp.*, No. 3:91–CV–2786–G, 1992 WL 486911, at *4 (N.D. Tex. Nov. 6, 1992) (refusing to find independent contractor status where dancer's "economic status [is] inextricably linked to those conditions over which defendants have complete control," such as timing of performances, atmosphere in club, and advertising).

BP argues that the degree of control factor weighs in favor of independent contractor status because Adams told Karna only tasks that needed to be completed but did not provide detailed instructions as to how they would be completed.  (*See* Def.'s Resp., at 8–9.)  Karna disputes this and suggests that, in fact, Adams and BP constantly gave him directions about tasks, controlled where his desk was, and controlled his hours.  (*See* Pl.'s Mot, at 12–14.)  Even assuming BP's asserted facts are true, some discretion in how one performs the responsibilities assigned does not indicate that Karna is an independent contractor.  *See Hopkins*, 545 F.3d at 343.  Many employees, especially skilled employees, are not micro-managed in the performance of their everyday tasks; this does not transform them into separate economic entities.

BP also relies on *Thibault v. Bellsouth Telecomm., Inc.*, 612 F.3d 843 (5th Cir. 2010) to argue that this factor weighs in favor of independent contractor status.  (*See* Def.'s Resp., at 11–

12.)  *Thibault* concededly discusses the defendant's control over the day-to-day aspects of how plaintiff performed his tasks as a splicer.  *Thibault*, 612 F.3d at 846–47. However, *Thibault* merely lists out all of the facts that bear on each factor; it is entirely unclear which of those facts, or even which factors, the *Thibault* Court relied on for its ultimate conclusion that the district court's finding of independent contractor status should be affirmed.

After reviewing the record, the Court concludes that the degree of control factor weighs in favor of finding that Karna was an employee.

### b. Relative Investments

"In applying the relative-investment factor, [courts] compare each worker's *individual* investment to that of the alleged employer."  *Hopkins*, 545 F.3d at 344 (citing *Herman*, 161 F.3d at 304) (emphasis in original).  Here, while Karna was allegedly an independent contractor, BP provided Karna with an office space, a computer, and access to all of the various technology office workers typically use.  (Pl.'s Mot., Ex. B, Karna Aff. ¶ 22; Pl.'s Mot., Ex. F, Adams Dep. 116:9–120:15.)  A secretary employed by BP also assisted Karna.  (Pl.'s Mot., Ex. B, Karna Aff. ¶ 24; Pl.'s Mot., Ex. B, Karna Aff., Ex. 6, March 2009 emails between McElhaney, Adams, and Karna.)  Furthermore, before October 2009, BP paid for Karna to attend various out-of state orientations and meetings, and provided Karna with a number of trainings.  (Pl.'s Mot., Ex. B, Karna Aff. ¶¶ 25–28.)  BP does not present any evidence to contest these facts.  Instead, BP states that Karna's investment was his expertise.  (*See* Def.'s Mot., at 12–13.)  However, every worker "invests" his know-how into the job he is tasked with.  BP's investments in office space, support staff, and trainings evince a greater overall investment than anything Karna has committed.  *See Herman*, 161 F.3d at 303–304 (finding defendant's investment more significant where it paid for office space, computers and fax machines, and advertising, and drivers only

provided cars, and other tools necessary to operate the vehicle on the job, such as two-way radios); *Hopkins*, 454 F.3d at 344 (finding defendant's provision of corporate offices and accounting services to sales leaders to weigh in favor of employee status when compared with sales leaders' investments in their individual offices). Accordingly, the Court concludes that the parties' relative investment weighs in favor of finding employee status.

### c.  Worker's Opportunity for Profit and Loss

The Court next considers who "controlled the major determinants of the amount of profit which the worker could make." *Hopkins*, 545 F.3d at 344 (citing *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1313 (5th Cir. 1976)) (quotations omitted). Here, Karna was paid an hourly rate set by BP, and his hours appeared to be determined by the external circumstances of how much work BP had at a given time. (*See* Def.'s Reply, Ex. E-2, Adams Dep., 161:11–23; Pl.'s Mot., Ex. B., Karna Aff. ¶ 18; Def.'s Mot., Ex. B-1, Karna Dep. 80:16–24; 81:22–82:13, 133:16–134:7; Def.'s Mot, Ex. D-8, March 10, 2009 RD Data Invoice.) In other cases where the Fifth Circuit has found a worker's opportunities for profit and loss indicative of independent contractor status, the worker typically could control how much he earned from working for the defendant. *See Herman*, 161 F.3d at 304 (upholding district court's finding that drivers controlled their own opportunities for profit and loss because they could control how many jobs they accepted); *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 750, 752 (5th Cir. 1983) (finding salesman controlled his opportunities for profit and loss where salesman controlled his customer volume and earned commission).

BP argues that Karna was in business for himself, as evidenced by the fact that he was engaged in a number of other enterprises while working at BP, including other consulting engagements, memberships in several partnerships which paid him referral fees, and teaching

BW classes on the weekends.  (Def.'s Resp., at 5–6; Def.'s Mot., Ex. B-1, Karna Dep. 38:11–40:15, 256:19–24, 270:25–272:1; Def.'s Resp., Ex. E-1, Karna Dep. 146:3–148:22, 256:4–20.) Karna concedes that, in March 2008, he performed somewhere between fifteen and twenty hours of BW consulting work for Champion Technologies; however, he presents evidence that from May 2, 2008 through October 19, 2009, he did not perform any consulting work for other companies.  (Def.'s Mot., Ex. B-1, Karna Dep. 270:25–272:1; Pl.'s Resp., Ex. A, Karna Aff. ¶ 21.)  BP does not controvert this evidence.  Karna additionally provides evidence that, although he received referral fees, he was only paid for four referrals between 2005 and 20011, and the referral fees were only about $5.00 or $10.00 per successful referral.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 23; Def.'s Resp., Ex. E-1, Karna Dep. 147:24–148:1.)  BP does not counter this evidence either.  Furthermore, no evidence is presented as to how much income, if any, Karna earned for teaching classes in BW.  The Fifth Circuit has held that "minor additional income made from work which is not connected with the actual business under examination is not relevant to a court's determination of employee status."  *Brock*, 814 F.2d at 1049.  Accordingly this Court finds that whatever minor income Karna may have received from referral fees or from weekend classes he taught does not compel a finding that he controlled his opportunities for profit and loss.

Finally, BP points to Karna's tax returns for 2008 and 2009 in support of its argument that Karna determined his own opportunities for profit and loss.  (Def.'s Resp., at 5–6.)  The Form 1040s do contain different income amounts than might be expected from the Form 1099s Karna received from Ideal for his work at BP, suggesting alternative sources of income. (*Compare* Def.'s Mot., Ex. D-9, Ideal Form 1099s, at 4–5 *with* Def.'s Resp., Exs. E-4, E-5 2008 and 2009 Form 1040s.)  BP also points out that, at least in 2008, Karna claimed expenses for the

business use of his home, again suggesting that Karna was in business for himself.  (*See* Def.'s Resp., at 5–6; Def.'s Resp., Ex. E-4 2008 Form 1040.)  Although it is difficult to ascertain all of the activities that might have contributed to the gross income numbers found in Karna's Form 1040s, it should be noted that the income returns are joint tax returns filed on behalf of Karna and his wife, and at least some of the income can be explained by the Karnas' real estate losses. (*See generally* Def.'s Resp., Exs. E-4, E-5 2008 and 2009 Form 1040s.)  The Court does not find that these tax returns, which appear to reveal income from entirely unrelated activities by the Karnas, are evidence that Karna controlled his opportunities for profit and loss with regard to his work as a SAP BW coordinator.  *See Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 267–68 (5th Cir. 1987) ("Economic dependence is *not* conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life.  Rather, the proper test of economic dependence mandates consideration of all the factors, and in light of such consideration examines whether the workers are dependent on a particular business or organization *for their continued employment* in that line of business.") (citations omitted).

### d.  Skill and Initiative

Courts next consider "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status."  *Hopkins*, 454 F.3d at 345 (citing *Usery*, 527 F.2d at 1314).  Unique skills or an ability to exercise significant initiative within the business are indicative of independent contractor status.  *Id.* (citing *Hickey*, 699 F.2d at 752 and *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993)).  However, "routine work which requires industry and efficiency is not indicative of independence and nonemployee status."  *Herman*, 161 F.3d at 305 (citing *Usery*, 527 F.2d at 1314).  Furthermore, although "[t]he lack of the requirement of specialized skills is indicative of employee status, the use of special skills is

20

not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998) (citing *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989) and *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1295 (3d Cir. 1991)).

Here, although Karna clearly possessed specialized BW skills, there is no indication that he employed those skills in a manner distinct from an employee. Even assuming that Karna possessed the degree of independent decision-making that BP contends he did, Karna nonetheless simply used his technical skills and expertise to complete the projects with which BP tasked him. (*See* Def.'s Resp., at 8–10 (citing numerous conversations between Adams and Karna).) BP controlled the ultimate terms of the projects he worked on, and the conditions of employment. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988). Indeed, evidence suggests that BP did not think of Karna as independent either, given that it sought to, and ultimately did, create an employee position to replace the contractor position Karna was occupying until October 19, 2009. (Pl.'s Mot., Ex. B, Karna Aff., Ex. 13, Permanent Recruitment Job Spec Template (indicating that the newly created position of EPDW/WR5/ER5 Applications Support Manager position is a replacement of a position filled in the interim by a contractor).) As a matter of economic reality, the mere fact that Karna possessed a unique skill set does not require finding independent contractor status here.

### e.  Permanency of the Relationship

Finally, courts consider "the permanency of the working relationship." *Hopkins*, 545 F.3d at 345 (citing *Brock*, 814 F.2d at 1047). Some considerations that bear on this factor include the length of the relationship between the parties, whether the worker provides similar

services to other companies, and the worker's ability to terminate the relationship.  *See id.*;
*Hickey*, 699 F.2d at 752.

Here, Karna worked for BP since August 2005, a substantial period of time.  (Doc. No.
17, Def.'s Mot., Ex. D-1, August 2005 Supplier Agreement between Deep and Ideal; Def.'s
Mot., Ex. B-1, Karna Dep. 33:4–5.)  Independent contractors typically work for an employer for
a shorter period of time.  *See Hopkins*, 454 F.3d at 346 (finding factor to weigh in favor of
employee status where plaintiffs worked for defendant for several years); *Robicheaux v. Radcliff
Material, Inc.*, 697 F.2d 662 at 666 (5th Cir. 1983) (characterizing relationships between
plaintiffs and defendant which spanned from ten months to three years as lasting a "substantial
period of time").  Additionally, contrary to BP's contention, Karna performed a minuscule
amount of BW-related work for other companies.  *See supra* Part III.A.1.c.  Finally, while BP is
correct that Karna could terminate the relationship with BP upon 14 days' notice (*see, e.g.*,
Def.'s Mot., Ex. D-1, D-2, D-3, Supplier Agreements between Ideal and Karna), this single fact
cannot transform him into an independent contractor; many employees may leave their jobs
freely.

BP also argues that Karna should be considered an independent contractor because
Karna had a lengthy history of working as an independent contractor providing BW-related
services for other companies.  (*See* Def.'s Resp., at 4.)  Although Karna admittedly spent four
years working as an independent contractor before coming to BP, his engagements with all of the
companies he worked for during that time were substantially shorter than his relationship with
BP.  (*See* Karna's 2007 Resume; Def.'s Mot., Ex. B-1, Karna Dep. 23:2–33:1.)  Although the
fact that a plaintiff had worked as an independent contractor in the past may be of some
relevance to determining whether he is an employee of the defendant, *see Talbert v. Am. Risk*

22

*Ins. Co., Inc.*, 405 Fed. App'x 848, 856 (5th Cir. 2010), this Court does not find such evidence particularly significant in a case like this, where all of the prior engagements were much briefer than the relationship at issue.

### f.  Other Factors

Because the factors above are non-exhaustive, courts typically consider any other factors the parties argue have bearing on whether the plaintiff is an employee under the FLSA.  *See Hopkins*, 454 F.3d at 346; *Herman*, 161 F.3d at 305.  BP makes several other arguments against a finding of employee status.

First, BP argues that Karna was hired to deliver a project, not to fill a permanent position. (Def.'s Mot., at 5; Def.'s Resp., at 13.)  Although BP contends Karna was hired to deliver a project, it is clear that Karna stayed on for far longer than the originally estimated four months. (Def.'s Mot., at 19;  Def.'s Mot., Ex. D-10, Schedule A to contract between Ideal and BP). Furthermore, BP's own evidence suggests that Karna's duties evolved as BP's needs changed with regard to WR5.  (*See* Def.'s Mot., at 5; Def.'s Mot., Ex. C, Daphne Adams Aff. ¶ 7.) Additionally, BP's own Permanent Recruitment Job Spec Template for the EPDW/WR5/ER5 Applications Support Manager position that Karna ultimately filled states that the position was intended to be a "replacement[] of a position filled in the interim by a contractor."  (Pl.'s Mot., Ex. B, Karna Aff., Ex. 13, Permanent Recruitment Job Spec Template.)  Finally, in April 2009, McElhaney described the position BP was creating as "ongoing as any we have."  (Pl.'s Mot., Ex. F, McElhaney Dep., Ex. 3, April 1, 2009 email from McElhaney.)   Contrary to BP's contentions, Karna's position at BP from May 2, 2008 through October 19, 2009 cannot be described as one project; rather, he shared ongoing responsibility for the WR5 system.

Next, BP argues that this Court should consider the fact that Karna, a "sophisticated, intelligent businessman," entered into contracts that stated he was an independent contractor. (Def.'s Resp., at 4, 13; *see, e.g.*, Def.'s Mot., Ex. D-1, D-2, D-3, Supplier Agreements between Ideal and Karna.)  BP also notes that Karna described himself as a contractor in 2007.  (Def.'s Resp., at 4, 13; Def.'s Resp., Ex. E-3, McElhaney Dep. 50:7–51:2.)  "A person's subjective opinion that he is a businessman rather than an employee does not change his status." *Hopkins*, 454 F.3d at 346 (citing *Brock*, 814 F.2d at 1049).  "[F]acile labels . . . are only relevant to the extent that they mirror economic reality." *Id.* (citing *Brock*, 814 F.2d at 1044).  Thus, while the Fifth Circuit has apparently condoned a district court's consideration of how plaintiffs and defendants perceive their relationship, *see Thibault*, 612 F.3d at 846, such facts are only relevant to the extent they conform to the economic reality of the relationship.  Here, all of the factors weigh in favor of employee status; stray comments and contractual language cannot alter the overwhelming evidence of Karna's employee status.

After considering the record, the Court concludes that Karna was an employee from between May 2, 2008 through October 19, 2009.  Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to this issue, and Defendant's Motion for Summary Judgment is **DENIED** as to this issue.

###       2.       Exemptions

"Although the reach of the FLSA is meant to be broad, its application is not unlimited." *Cleveland v. City of Elmendorf, Tex.*, 388 F.3d 522, 526 (5th Cir. 2004) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, (1947)).  The FLSA exempts certain employees from its requirement of overtime compensation.  However, exemptions to the FLSA's overtime provisions must be "narrowly construed against the employers seeking to assert [them], leaving

the employer with the burden of establishing its entitlement to the exemption." *Chicca v. St. Luke's Episcopal Health Sys.*, 858 F. Supp. 2d 777, 783 (S.D. Tex. 2012) (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960) and *Dole v. Mr. W Fireworks, Inc.*, 889 F.2d 543, 546 (5th Cir. 1989)); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006).  Two of the exemptions available under the FLSA, the computer professional exemption and the highly compensated employee exemption, are at issue in this case.  *See* 29 U.S.C. §§ 213(a)(1), 213 (a)(17); 29 C.F.R. § 541.601.[7]

### a.    Computer Professional Exemption

The regulations provide detailed guidance on how the professional exemption is to be applied to computer employees.  They define this exemption as follows:

> (b) The section 13(a)(1) exemption applies to any computer employee compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities, and the section 13(a)(17) exemption applies to any computer employee compensated on an hourly basis at a rate not less than $27.63 an hour. In addition, under either section 13(a)(1) or section 13(a)(17) of the Act, the exemptions apply only to computer employees whose primary duty consists of:
>> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

---

[7] Specifically, Court understands BP's argument to be that from May 2, 2008 through October 19, 2009, Karna was exempt as a computer professional, and from October 19, 2009 through February 22, 2011, Karna was exempt as a highly compensated employee who customarily and regularly performed the duties of a computer professional or, in the alternative, the duties of an administrative employee.  Despite some contradictory statements in BP's briefing, the Court does not understand BP to be arguing that, from October 19, 2009 through February 22, 2011, Karna was exempt as an administrative employee or as a computer professional.  This much is clear from the structure of BP's Motion for Summary Judgment.  (*See* Def.'s Mot., at 17–23.)

29 C.F.R. § 541.400(b).  The regulations make clear that not all employees who work with computers are to be exempted under the FLSA.  Such a reading of the exemption would be "an understandable mistake, one that arises from the common perception that all jobs involving computers are necessarily highly complex and require exceptional expertise."  *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 580 (6th Cir. 2004).  Instead, "the regulations provide that an employee's primary duty must require 'theoretical and practical application of highly-specialized knowledge *in computer systems analysis, programming, and software engineering*' not merely 'highly-specialized knowledge *of computers and software.*'"  *Id.* (emphasis in original).

The record is clear that, between May 2, 2008 and October 19, 2009, Karna received an hourly wage greater than $27.63, and between October 19, 2009 and February 22, 2011, Karna received a salary in excess of $455 per week.  (Def.'s Mot., Ex. B-1, Karna Dep. 80:16–24; 81:22–82:13, 133:16–134:7; Def.'s Mot, Ex. D-8, March 10, 2009 RD Data Invoice; Def.'s Mot., Ex. A-2, September 11, 2009 email enclosing September 10, 2009 offer letter from McElhaney to Karna.)  At issue is whether Karna's primary duties while he was employed at BP were one or more of the four duties found in 29 C.F.R. § 541.400(b).  BP moves for summary judgment on the applicability of this exemption, arguing that between May 2, 2008 and October 19, 2009, Karna's primary duties consisted, at minimum, of the duties described in 29 C.F.R. § 541.400(b)(1) and (2).  (Def.'s Mot., at 19–21; Def.'s Resp., at 14–18.)  Karna also moves for summary judgment on the applicability of this exemption, arguing that, throughout the relevant time period, Karna's primary duties were not the duties of a computer professional.  (Pl.'s Mot., at 20–21.)

To determine whether an employee falls under the computer professional exemption, a court must engage in a detailed analysis of the employee's job responsibilities and determine

whether the employee's *primary* duty is one of the duties of exempt professional or administrative employees.  *See* 29 U.S.C. § 213(a)(17); 29 C.F.R. § 541.400(b); 29 C.F.R. § 541.200(a).  An employee's primary duty is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee."  29 C.F.R. § 541.700(b).  However, time is not the sole test; courts should focus on what the employee does that is "of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time."  *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) (internal citations omitted).  "In determining an employee's principal duty, courts consider the actual, day-to-day job activities of the employee, and not the labels the employee or the employer place on those duties."  *Chicca*, 858 F. Supp. 2d at 783 (citing *Kohl v. Woodlands Fire Dep't*, 440 F. Supp. 2d 626, 634 (S.D. Tex. 2006)); *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 404 (5th Cir. 2002). "To discern what an employee's actual, day-to-day job activities are, general job descriptions contained in an employee's resume or prepared by the employer may be considered, but are not determinative, and descriptions contained in depositions and affidavits should be considered as well."  *Id.*  (citing *Kohl*, 440 F. Supp. 2d at 634).

BP states that "Karna's job was to plan, schedule, and coordinate activities required to design, develop, build, enhance and support the WR5 System."  (Def.'s Mot., Ex. C. Adams Aff. ¶ 9.)  To perform this job, Adams contends that Karna "reviewed technical and functional design specifications and computer coding for the WR5 system, provided feedback to the third party vendors (the developer), consulted with the users (the business) to understand its functional requirements, and then communicated that information to the WR5 developers."  (*Id.*)  Karna

was then responsible for ensuring that the technical specifications prepared by the developers expressed the business's functional specifications and complied with BP internal standards.  (*Id.*) Despite disputing some of the precise language used by BP to describe his work, Karna appears to concede that he planned and coordinated activities related to modifying and maintaining the WR5 system; however, he maintains that he did not have any input about what the system would ultimately look like or the tasks it would accomplish, as these decisions were made by IBM and the business users of WR5.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 46; Pl. Mot., Ex. A, Karna Aff. ¶¶ 25–28.)  Furthermore, he represents that IBM was responsible for ensuring that the technical specifications prepared by the developers expressed the business's functional specifications. (Pl.'s Resp., Ex. A, Karna Aff. ¶ 49.)

Adams also states that Karna coordinated the testing of the WR5 system and performed testing, collaborated with users to determine necessary modifications, to user inquiries, provided guidance, participated in training users on WR5, and participated in the enhancement of the system.  (Def.'s Mot., Ex. C. Adams Aff. ¶ 9.)  These statements Karna disputes.  He represents that he performed end-user testing only rarely, and that most such testing was done by end-users.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 55.)  He also contends that, for the most part, IBM worked directly with end-users, and he performed limited work related to enhancements.  (*Id.* ¶¶ 56, 57.) Finally, he contends IBM performed most of the testing.  (*Id.* ¶ 58.)

Karna's resume covering the time period leading up to October 19, 2009 does not shed any additional light on Karna's duties at BP from May 2, 2008 through October 19, 2009, as it does not break down Karna's duties by time period, or even by employer.  (*See* Def.'s Mot., Ex. C-2, Karna's 2009 resume.)  Nor has the Court been presented with a job posting for the position Karna filled during this time period.

28

Karna's duties after October 19, 2009, do not seem markedly different.  The job posting for the WR5/ER5 Applications Support Manager position indicated that Karna would be "responsible to deliver daily Business Warehouse/Management Information ('BW/MI') application support management and analysis services, ensuring timely response and resolution to support requests of . . . WR5/ER5."  (Def.'s Mot., Ex. A-8, June 15, 2009 Job Posting.) Adams, who remained Karna's supervisor, stated that, as the WR5/ER5 Applications Support Manager, Karna coordinated all WR5 activities, including enhancements and project delivery, to ensure quality support services to the business.  (Def.'s Mot., Ex. C. Adams Aff. ¶ 13.)  Adams also stated that Karna was involved with conducting testing, providing training, and identifying solutions with the third party vendor.  (*Id.*)  Karna again disputes he had these duties.  (Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 71–74.)  One additional duty BP contends Karna had as a salaried employee was "design[ing] remediation actions to resolve gaps in compliance with BP's standards for Sarbanes Oxley."  (Def.'s Mot., Ex. C. Adams Aff. ¶ 13.)  Karna disputes that he performed this task.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 75.)  No resume covering Karna's work after 2009 is available.

> ### i.   The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications

Based on both parties' characterizations of Karna's responsibilities, the Court can conclude Karna's primary duty was that of assisting Adams in serving as a liaison between business users and third parties who made necessary modifications to WR5.  However, whether the responsibilities he had as a liaison fall within the computer professional exemption remains uncertain.  Merely doing some work related to the development of WR5 is not sufficient to make Karna an exempt employee.  Systems analysis involves making "actual, analytical decisions

29

about how [the defendant's] computer network *should* function." *Chicca*, 858 F. Supp. 2d at 786

(citing *Ind. Mich. Power Co.*, 381 F.3d at 580) (emphasis added).  Here, although parties do not

appear to dispute that Karna consulted with users, there is conflicting evidence on whether Karna

had any say as to what WR5 would actually look like, or whether he functioned merely as a

liaison between two groups that retained all decision-making authority.  (*Compare* Pl.'s Resp.,

Ex. A, Karna Aff. ¶¶ 55–58, 71–74 *with* Def.'s Mot., Ex. C. Adams Aff. ¶¶ 9, 13.)  Accordingly,

the Court cannot say, on the evidence presented, whether Karna's primary duty involved the use

of systems analysis techniques to determine what hardware, software or system functional

specifications BP would employ.  *See Ind. Mich. Power Co.*, 381 F.3d at 580–81 (declining to

find employee was exempt as a computer professional where he consulted with users for the

purposes of repair, not for the purposes of determining what hardware, software or system

functional specifications the defendant would employ).

> ii.    **The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications**

Similarly, the Court cannot say whether Karna's duties as a liaison between third party

developers and business users involved design, development, documentation, analysis, creation,

testing or modification of computer systems or programs, based on and related to user or system

design specifications.  Karna disputes that he was involved in the actual design, development, or

building of WR5, and BP does not appear to contest this.  (*See* Pl.'s Resp., Ex. A, Karna Aff. ¶¶

51–55; Def.'s Mot., Ex. C. Adams Aff. ¶¶ 9, 13; Def.'s Resp., at 14–18.)  However, the scope of

the exemption also reaches to documentation, analysis and modification of computer systems.

Factual questions exist as to the extent Karna worked with business users and third party

developers on enhancements and necessary changes to WR5.  *See supra* Part III.A.2.a.  If Karna

did, in fact, have some say in the modifications, and if collaborating with developers and users to determine the necessary modifications was a significant portion of what Karna did as a liaison between end-users and developers, he would be an exempt computer professional.  Additionally, it is not clear whether facilitating between business users and IBM included documentation or analysis of WR5 or its prototypes.  Although neither party has explained the process by which Karna performed his facilitation duties, it is hard to imagine that he did not engage in some analysis and documentation of WR5 as part of his responsibilities.  Indeed, the job posting for WR5/ER5 Applications Support Manager position indicated that Karna would provide "analysis services."  (Def.'s Mot., Ex. A-8, June 15, 2009 Job Posting.)  The extent of any analysis and documentation of WR5 that Karna performed may also allow a jury to conclude that Karna was an exempt computer professional.  Finally, while Karna has produced some evidence that the amount of time he spent conducting testing was minimal and BP does not appear to dispute this characterization (*see* Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 51–55; Def.'s Resp., at 14–18), a jury may find significant the end-user testing Karna conducted when viewed *in combination* with other evidence that BP may produce at trial regarding Karna's analysis, documentation or modification of WR5.

For the reasons stated above, neither Karna nor BP is entitled to summary judgment on the question of whether Karna was an exempt computer professional.  Karna's Motion for Partial Summary Judgment on the applicability of the computer professional exemption is **DENIED**, and BP's Motion for Summary Judgment on the applicability of the computer professional exemption is **DENIED**.

### b.    Highly compensated employee

"An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the [FLSA] if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee. . . ."  29 C.F.R. § 541.601(a).  "'Total annual compensation' must include at least $455 per week paid on a salary or fee basis."  29 C.F.R. § 541.601(b).  Unlike the computer professional exemption, the highly compensated employee exemption does not require the courts to engage in as rigorous an analysis of the employee's job duties.  *See* 29 C.F.R. § 541.601(c) ("A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties.").  Instead, a court need only find that a highly compensated employee *customarily and regularly* performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee.  29 C.F.R. § 541.601(a).  The regulations define the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."  29 C.F.R. § 541.701.

The record is clear that between October 19, 2009 and February 22, 2011, Karna earned over $100,000 per year on a salary basis.  (Def.'s Mot., Ex. A-2, September 11, 2009 email enclosing September 10, 2009 offer letter from McElhaney to Karna; Def.'s Mot., Ex. A-4, October 19, 2009 – October 31, 2009 pay stub; Def.'s Mot., Ex. A-4, June 1, 2010 – June 15, 2010 pay stub.)  BP contends that, during this time period, Karna also customarily and regularly performed the duties of a computer professional or, in the alternative, an administrative employee.  (Def.'s Mot., at 21–23.)

32

###### i.    Duties of a computer professional

BP points to the WR5/ER5 Applications Support Manager job posting and Adams'
affidavit in support of its argument that Karna customarily and regularly and regularly performed
the duties of a computer professional.  However, as explained *supra* Part III.A.2.a, far too many
fact questions exist as to whether Karna's job involved the performance of those precise duties
identified in 29 U.S.C. § 213(a)(17) and 29 C.F.R. § 541.400(b).   Just as the Court cannot
determine if these duties were Karna's primary duties, it cannot determine if they were his
customary and regular duties.  BP's Motion for Summary Judgment on this issue is **DENIED**.

###### ii.    Duties of an administrative employee

The Court must next determine whether Karna customarily and regularly performs any
one or more of the exempt duties or responsibilities of an administrative employee.  29 C.F.R.
§ 541.601(a).  The FLSA regulations define the term "employee in a bona fide administrative
capacity" as one who is:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week .
> . . exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly
> related to the management or general business operations of the employer or the
> employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent
> judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  Whether a given duty is directly related to management policies or
general business operations depends whether the duty "directly relate[s] to assisting with the
running or servicing of the business, as distinguished, for example, from working on a
manufacturing production line or selling a product in a retail or service establishment."  29
C.F.R. § 541.201(a); *see also Chicca*, 858 F. Supp. 2d at 788; *Kohl*, 440 F. Supp. 2d. at 634–35.
"To qualify for the administrative exemption, an employee's primary duty must include the

exercise of discretion and independent judgment with respect to matters of significance. . . .  The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  However, because BP is arguing that Karna is exempt as a highly compensated employee, there is no need to determine whether Karna customarily and regularly performed *all* of the duties of an administrative employee.  *See* 29 C.F.R. 541.601(c) ("[A] highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee.")  Moreover, numerous district courts have specifically held that the highly compensated employee exemption "removes any requirement that an employer prove that an administrative employee exercised discretion in the performance of her duties."  *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 478 (S.D.N.Y. 2008); *accord Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1369 (N.D. Ga. 2009); *Mamola v. Group Mfg. Servs., Inc.*, No. CV–08–1687–PHX–GMS, 2010 WL 1433491, at *12 (D. Ariz. April 9, 2010); *Ogden v. CDI Corp.*, No. CV08–2180 PHX DGC, 2009 WL 4508502, at *2 n.2 (D. Ariz. Dec. 1, 2009).

Here, it is uncontested that Karna performed non-manual office work.  After reviewing BP's and Karna's descriptions of his job, the Court has no doubt that he customarily and regularly performed work directly related to the management or general business operations of BP.  WR5 is the system BP uses to access and review financial data.  (Adams Aff. ¶¶ 3–4; Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 9, 12.)  Such a system is an essential part of the business operations of any company.  Serving as a liaison between the business users at BP and the third parties responsible for making necessary modifications to WR5 constitutes performing work that is directly related to the general business operations of BP.  Karna does not dispute that this was his

role.  (*See* Pl.'s Mot., Ex. A, Karna Aff. ¶¶ 8, 15, 17, 25–28; Pl.'s Resp., Ex. A, Karna Aff. ¶ 46.)

The fact that the parties disagree about precisely how much direction Karna received from

Adams, how much authority he had to actually shape modifications to WR5, and whether he did

or did not personally design remediation actions to resolve gaps in compliance with BP's

Sarbanes-Oxley Act standards is irrelevant because the highly compensated employee exemption

does not require a finding that Karna exercised discretion and independent judgment with respect

to matters of significance.  *See* 29 C.F.R. 541.601(c); *Amendola*, 558 F. Supp. 2d at 478;

*Coppage*, 665 F. Supp. 2d at 1369; *Mamola*, 2010 WL 1433491, at *12; *Ogden*, 2009 WL

4508502, at *2 n.2.

Based on the foregoing, BP's Motion for Summary Judgment on this issue is

**GRANTED**.

### 3.    Willfulness

Any claim for unpaid minimum wages or unpaid overtime wages must be "commenced

within two years after the cause of action accrue[s] . . . except that a cause of action arising out

of a willful violation may be commenced within three years after the cause of action accrue[s]."

29 U.S.C. § 255(a). A violation is willful if the "employer either knew or showed reckless

disregard for . . . whether its conduct was prohibited by the statute."  *Singer v. City of Waco,

Tex.*, 324 F.3d 813, 821 (5th Cir. 2003) (citing *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir.

1994)); *Mireles v. Frio Foods*, 899 F.2d 1407, 1416 (5th Cir. 1990) (citing *McLaughlin v.

Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  A plaintiff bears the burden of showing that an

FLSA violation was willful.  *Stokes v. BWTX Pantex, L.L.C.*, 424 Fed. App'x 324, 326 (5th Cir.

2011) (citing *Singer*, 324 F.3d at 821).

Plaintiff has presented evidence that would allow a factfinder to conclude BP acted with reckless disregard for whether its conduct was prohibited by law.  Specifically, if the factfinder finds credible Karna's testimony that Adams repeatedly told him not to bill more than forty-five to fifty hours per week, this could support a finding that BP acted with reckless disregard as to whether its conduct violated the FLSA.  (*See* Pl.'s Resp., Ex. A, Karna Aff. ¶ 76.)  Similarly, evidence that Elance did not allow employees to enter more than fifty hours a week, and evidence of a culture of "burying time" could also support a finding of willfulness.  (*See* Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 78–79; Pl.'s Mot. Ex. F, Adams Dep. 172:12–173:25.)  Accordingly, BP's Motion for Summary Judgment on this issue is **DENIED**.

### B.      Quantum Meruit

To establish a claim for quantum meruit, a plaintiff must show that he (1) provided valuable services or materials, (2) for the benefit of the defendant, (3) that were accepted by the defendant, and (4) the defendant had reasonable notice that the plaintiff expected compensation for the services or materials.  *Concept Gen. Contracting, Inc. v. Asbestos Maint. Servs., Inc.*,  346 S.W.3d 172, 183 (Tex. App.—Amarillo 2011, pet. denied) *(citing Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) *and Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 159 (Tex. App.—Amarillo 2000, no pet.)).  "[A] plaintiff may not recover under the general rule of quantum meruit when the claim pleaded fits within the subject matter of a contract between the parties."  *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000) (citing *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988)).  BP moves for summary judgment, arguing that Karna's quantum meruit claim must fail because Karna's work on WR5 was covered by express contracts, and because BP had no notice that Karna expected payment for any time not submitted for payment.  (Def.'s Mot., at 10–12.)

Karna contends that no contract covers the unbilled hours Karna worked for BP, and BP had notice that Karna expected payment for that work based on repeated conversations about the matter with Adams.  (Pl.'s Resp., at 29–30.)

Before addressing the merits of these arguments, the Court must determine whether Karna's claim is preempted by the FLSA.[8]  The Fifth Circuit has not issued a published opinion on whether the FLSA preempts state law claims.  *See Floridia v. DLT 3 Girls, Inc.*, No. 4:11-CV-3624, 2013 WL 127448, at *5 (S.D. Tex. Jan. 9, 2013).  However, a number of courts have held that common law claims are preempted by the FLSA to the extent the plaintiff seeks damages for unpaid minimum wages or unpaid overtime compensation.  *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192–95 (4th Cir. 2007) (finding that "[b]ecause the FLSA's enforcement scheme is an exclusive one, . . . FLSA-based contract, negligence, and fraud claims are precluded under a theory of obstacle preemption); *Roman v. Maietta Constr., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998) (same); *Lilani v. Noorali*, No. Civ. A. H–09–2617, 2011 WL 13667, at *7–8, 12 (S.D. Tex. Jan. 3, 2011) (holding that plaintiff's breach of contract and quantum meruit claims based on employer's alleged failure to pay "fair wages" were preempted by the FLSA); *Guerrero v. JPMorgan Chase & Co.*, No. 6:09–CV–388, 2010 WL 457144, at *3–4 (E.D. Tex. Feb. 5, 2010) (holding that plaintiff's state law claims based on alleged failure to compensate plaintiff for hours worked in excess of forty were preempted by the FLSA); *Botello v. COI Telecom, LLC*, No. SA–10–CV–305–XR, 2010 WL 3784202, at *4 (W.D. Tex. Sept. 21, 2010).  Courts have recognized state law claims which fall outside the minimum wage and overtime

---

[8] Although neither party raised the issue initially, the Court requested supplemental briefing on the question of whether Karna's quantum meruit claim is preempted by the FLSA.  (Doc. No. 52, Order.)  Both parties have now provided briefing on the matter.  (*See* Doc. Nos. 53, 54.)  In its briefing, BP also argues that Plaintiff's breach of contract, negligent and fraudulent misrepresentation and promissory estoppel claims are preempted to the extent they seek damages for unpaid minimum wages or overtime wages.  (Doc. No. 54, Def.'s Supplemental Briefing Regarding Preemption, at 1–2, 5–6.)  The Court finds that none of these other claims are premised on a claim of unpaid minimum wages or overtime wages; rather, they are premised on alleged agreements or representations about compensation.  *See infra* Parts III.C–F.

provisions of the FLSA are not preempted. *Floridia*, 2013 WL 127448, at *5; *Doan v. Portable Prod. Servs., LP*, No. CIV. A. H-11-0261, 2011 WL 2038580, at *4 (S.D. Tex. May 19, 2011) (distinguishing plaintiff's claim from *Lilani* because plaintiff requested compensation for all hours worked relative to the agreed payment schedule). However, this line of cases refers specifically to when a party raises a "straight time" claim, a claim for compensation for hours worked in a week that are not in excess of forty and for wages owed above those mandated by the minimum wage provisions of the FLSA. *Floridia*, 2013 WL 127448, at *5; *Doan*, 2011 WL 2038580, at *4.

Here, Karna seeks payment for hours worked in excess of those submitted to Ideal. (*See* Pl.'s Resp., at 29.) This is not a "straight time" claim, and Karna does not contend it is. (*See id.*; Pl.'s Mot., Ex. , Karna Aff., Ex. 13, Elance hours; Pl.'s Mot., Ex. A, Karna Aff., Ex. 12, Project Server Hours; Def.'s Mot., Ex. B-1, Karna Dep. 237:3–6.) Instead, he argues that his quantum meruit claim is not preempted because it is a fallback claim should the Court determine that Karna was not employee from May 2, 2008 through October 19, 2009, and because a quantum meruit claim has a longer statute of limitations than the FLSA. (Doc. No. 53, Pl.'s Resp. to the Court's Order for Expedited Briefing, at 2.) Neither argument is availing. First, the Court has already determined Karna was an employee from May 2, 2008 through October 19, 2009. *See supra* Part III.A.1. Second, the fact that state law causes of action may have more generous statutes of limitations than the FLSA is an argument in favor of, not against, preemption. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192–95 (noting the different statutes of limitation between state law claims and the FLSA before finding that allowing plaintiffs to proceed on FLSA-based state claims would "stand[] as an obstacle to the accomplishment of the full purposes and objectives of" the FLSA).

Because the Court holds that Karna's quantum meruit claim is preempted by the FLSA, it need not address the remainder of the parties' arguments regarding quantum meruit.  BP's Motion for Summary Judgment on this issue is **GRANTED**.

### C.      Breach of Contract

The elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Mullins v. TestAmerica, Inc.,* 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)); *Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 140 (Tex. App.—Corpus Christi 2008, no pet.)

BP argues that Karna cannot show the existence of a valid oral contract for a base salary of $140,000, a sign-on bonus of $40,000 and a 30% VPP because the terms of any alleged agreement are too vague to be enforceable.  (Def.'s Mot., at 13–15.)  *See Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.—Corpus Christi 2004, no pet.) ("[T]he terms of an oral contract must be clear, certain and definite.")  BP points out that Karna himself admits that McElhaney did not say how much compensation Karna would receive "in lieu of" a lower than expected base salary.  (Def.'s Mot, Ex. B-1, Karna Dep. 308:1–23, 324:4–15.)  However, the discussions BP relies upon, which allegedly occurred in September of 2009 (*see id.*), are not the basis of Karna's breach of contract claim.  Instead, Karna's claim arises out of a meeting that allegedly took place in July 29, 2009, which he recounts in one of his affidavits.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 90.)  Karna alleges that McElhaney represented that BP would offer a base salary of $140,000, a sign-on bonus of $40,000, and a high-end Variable Payment Program ("VPP") bonus if he agreed to become a salaried employee.  (*Id.*)  Adams allegedly clarified that the VPP would be

30%.  (*Id.*)  Karna states that he "accepted the offer on the spot."  (*Id.*)   On these facts, the offer Karna allegedly accepted is sufficiently definite to form the basis of a valid contract.

BP then argues in its reply that any alleged oral contract made between Karna and McElhaney was superseded by the subsequent agreement Karna made with BP.  (Def.'s Reply, at 9.)  BP is correct that a subsequent written agreement supersedes an inconsistent prior oral agreement.  *McCamy v. Gen. Elec. Supply Corp.*, 185 F.2d 944, 946 (5th Cir. 1950) (holding that where prior oral contract was inconsistent with terms of a subsequent written contract of employment, written contract superseded and cancelled prior oral contract); *Leon Ltd. v. Albuquerque Commons P'ship*, 862 S.W.2d 693, 708 (Tex. App.—El Paso 1993, no writ) (same).  Karna did send an email responding to the terms in BP's written offer of employment, in which he stated, "I accept."  (Def.'s Mot., Ex. A-3, September 2009 emails between Karna and BP Human Resources regarding new position.)  However, here, it is not clear that a subsequent written agreement exists because Karna allegedly never signed the employment contract sent to him on September 11, 2009.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 90.)  *Cf. Simmons & Simmons Const. Co. v. Rea*, 286 S.W.2d 415, 419 (Tex. 1955) ("[T]he general rule [is] that when a contract between two parties is reduced to writing and signed by one party and expressly accepted orally by the other, it is sufficient to impress upon it the character of a written instrument, and [] a written instrument signed by one party and expressly accepted orally by the other becomes a written contract."); *In re Robison*, 335 S.W.3d 776, 782–83 (Tex. App.—Amarillo 2011) (orig. proceeding) (declining to decide whether subsequent acceptance via fax of a settlement offer satisfied the requirement under Texas law that settlement agreements be "in writing" because, in any event, acceptance occurred after the settlement offer expired).  BP cites no cases, and this Court could find none, holding that a written offer and written acceptance, but

no signed contract between the parties, constitute a written contract capable of superseding a prior oral contract.  Similarly, BP cites no cases suggesting a subsequent agreement, even if not considered a written contract, supersedes prior inconsistent oral agreements.  Although this Court finds bizarre the conclusion that a written offer and a written acceptance may not suffice to constitute a written contract, this does appear to be the logical inference to be drawn from the case law.  *Cf. Simmons*, 286 S.W.2d at 419; *In re Robison*, 335 S.W.3d at 782–83.

For the foregoing reasons, BP's Motion for Summary Judgment on Karna's breach of contract claim is **DENIED**.

### D.    Negligent Misrepresentation

"The elements of a cause of action for negligent misrepresentation are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation."  *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (citing *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).  BP argues that Plaintiff's claim for fraudulent misrepresentation fails because (1) none of the statements that form the basis of this claim qualify as misrepresentations of existing fact, (2) Karna has no evidence that he justifiably relied on the alleged statements, and (3) Karna has no evidence of damages resulting from the reliance. (Def.'s Mot., at 24–27.)  Karna argues that the alleged statements by McElhaney and Adams that if Karna did not agree to become a salaried employee, BP would replace him, and McElhaney's statement that Karna would be placed at the top of the G pay grade were false statements

41

sufficient to support his claim of negligent misrepresentation.  (Pl.'s Resp., at 30–31.)  He contends he relied on these statements in accepting the salaried position, causing him to earn substantially less than he would have had he remained an hourly employee.  (*Id.*)

"[T]he sort of 'false information' contemplated in a negligent misrepresentation case is a misstatement of *existing fact,* not a promise of future conduct."  *Allied Vista*, 987 S.W.2d at 141 (citing *Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 294 (Tex. App.— El Paso 1992, writ denied)) (emphasis in original).  Texas courts have held that representations about future conduct, and specifically about the terms of future employment, are not statements of existing fact.  *See id.* (holding that alleged promise that defendant would provide plaintiff with equipment to start plant and an annual salary of $55,000 are "insufficient to establish negligent misrepresentation as a matter of law because they do not constitute a representation of existing fact"); *Manon v. Solis*, 142 S.W.3d 380, 388 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (finding that defendant's alleged misrepresentations as to the conditions under which plaintiff would be employed by defendant's firm "concern promises of future conduct, [and] cannot form the basis for a tenable negligent misrepresentation claim").  Accordingly, Plaintiff's allegation that McElhaney promised Karna that he would receive a salary at the top of the G pay grade cannot form the basis of a negligent misrepresentation claim.

Karna's allegation that statements by Adams and McElhaney that BP would replace him if he did not agree to become a salaried employee also cannot support a claim of negligent misrepresentation.  Karna has produced no evidence that these representations were false.  Karna contends these representations were false because BP never considered hiring anyone else for the job, and internal BP documents indicate that, if BP could not convert Karna to a salaried employee, they would continue to retain him as a contractor.  (*See* Pl.'s Mot., Ex. F., McElhaney

Dep., Exs. 2, 3, 2009 emails between McElhaney and others at BP; Pl.'s Resp., Ex. G, Headcount Discussion Spreadsheet.)   In fact, the emails from McElhaney only show a long-standing interest in converting Karna to a salaried employee; they never indicate that BP was not considering hiring anyone else for the position.  (*See* Pl.'s Mot., Ex. F., McElhaney Dep., Exs. 2, 3, 2009 emails between McElhaney and others at BP.)  Similarly, the spreadsheet Karna relies on never suggests that if Karna did not accept the position, BP would not hire anyone else; in fact, though it acknowledges the outstanding offer to Karna, the spreadsheet specifically provides that the recruitment source was "Potential Contractor Convert Vijay [sic] Karna, *if not External posting*."  (Headcount Discussion Spreadsheet (emphasis added).)  This only bolsters the truth of Adams and McElhaney's alleged representations that if Karna did not become a salaried employee, BP would seek another candidate to fill the position.  Furthermore, Adams had even identified a back-up candidate for the position.  (Def.'s Mot., Ex. C-3, July 9, 2009 email from Adams.)  Contrary to Karna's contention, the column in the spreadsheet titled "Stop if we don't get," which indicates that BP would "Continue with contractor and [be] unable to reduce overall staff costs," does not show that, if *Karna* did not accept the position, BP would continue with him in the contractor position; it simply suggests that if BP could not recruit *someone*, either Karna or another candidate, it would continue with a contractor.   (Headcount Discussion Spreadsheet.)

For the reasons stated above, Karna has produced no evidence of false representations necessary to make out a claim of negligent misrepresentation.  Accordingly, the Court need not consider the remainder of the parties' arguments as to this claim.  BP's Motion for Summary Judgment as to this issue is **GRANTED**.

### E.    Fraudulent Misrepresentation

43

To prevail on a claim of fraudulent misrepresentation, a plaintiff must show: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, it knew the representation was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff act on it; (5) the plaintiff acted in reliance upon the representation; and (6) the plaintiff suffered injury. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998)).  BP raises the exact same arguments against Plaintiff's fraudulent misrepresentation claim as it raised against his negligent misrepresentation claim.   (Def.'s Mot., at 24–27.)  Karna raises the same responses as well.  (Pl.'s Resp., at 30–31.)

BP wrongly suggests that a promise of future conduct cannot satisfy the requirement of false representation required for fraud.  (*See* Def.'s Mot., at 24–27.)  In fact, Texas case law provides that, for fraudulent misrepresentation, "[a] promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act."  *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Stone v. Enstam*, 541 S.W.2d 473, 480–81 (Tex. Civ. App.—Dallas 1976, no writ) ("Where statements or representations are alleged to have been fraudulent but are in the nature of a promise or of an act to be performed in the future and not statements of existing facts, such statements cannot legally be said to be a fraudulent misrepresentation unless it is alleged and proved that at the time the statement or promise was made the person making the same did not intend to perform it.")  Nonetheless, as explained above, there is no evidence that, at the time Adams and McElhaney allegedly told Karna BP intended to hire another individual to fill the

salaried position of WR5/ER5 Applications Support Manager if he did not accept the position, BP did not intend to seek an individual to fill this position.  *See supra* Part III.E.  Indeed, evidence suggests that BP had a back-up candidate in mind and intended to seek external candidates for the position.   (Headcount Discussion Spreadsheet; July 9, 2009 email from Adams.)

Similarly, there is no indication that, when McElhaney allegedly told Karna that he would receive a salary at the top of the G range, he did not intend to obtain such a salary for Karna.   Indeed, in an email McElhaney sent to others at BP about an appropriate salary for Karna, McElhaney states, "Given his skill set with BW we may have to pay to the high end of G vs. the midpoint that I suspect Jaime used in her numbers."  (Pl.'s Mot., Ex. F, McElhaney Dep., Ex. 3, March 31, 2009 email from McElhaney.)  Karna appears to rely only on the fact that the base salary he ultimately received, $125,000, placed him approximately in the middle of the G pay grade. (Pl.'s Resp., Ex. H, Base Salary Chart (indicating that grade G ranges from $87,000 to $162,000).)  "Failure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made."  *Spoljaric*, 708 S.W.2d at 435.

For the reasons stated above, Karna has produced no evidence of false representations necessary to make out a claim of fraudulent misrepresentation.  Accordingly, the Court need not consider the remainder of the parties' arguments as to this claim.  BP's Motion for Summary Judgment as to this issue is **GRANTED**.

F.     **Promissory Estoppel**

The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance on the promise by the promisor, and (3) substantial detrimental reliance by the promisee. *Gilmartin v. KVTV—Channel 13*, 985 S.W.2d 553, 558 (Tex. App.—San Antonio 1998, no pet.) (citing

*English v. Fischer,* 660 S.W.2d 521, 524 (Tex. 1983)); *Hern Family Ltd. P'ship v. Compass Bank*, 863 F. Supp. 2d 613, 630 (S.D. Tex. 2012).   Reliance on the promise must be reasonable and justified.  *Gilmartin*, 985 S.W.2d at 558 (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997); *Sipco Servs. Marine, Inc. v. Wyatt Field Serv. Co.*, 857 S.W.2d 602, 605 (Tex. App.—Houston [1st Dist.] 1993, no writ)).  Vague and illusory promises are not the sort of promises that may be reasonably relied upon.  *Id.*  "The justifiableness of the reliance is judged in light of the plaintiff's intelligence and experience."  *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 358, 361 (5th Cir. 1996) (citing *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir. 1996).  "A plaintiff's reliance is unjustified when the reliance is in effect an act of negligence on the plaintiff's part."  *Id.* at 358

BP argues that the alleged promises that form the basis of Karna's promissory estoppel claim could not have induced justifiable reliance.  (Def.'s Mot., at 27.)  Karna's response does not address directly promissory estoppel, simply relying on his arguments in support of fraudulent misrepresentation and negligent misrepresentation.  (*See* Pl.'s Resp., at 30–31.)  Only one of the two statements discussed in that portion of Karna's brief can form the basis of a promissory estoppel claim.  Alleged statements that BP would hire someone to replace Karna if he did not accept the salaried position cannot form the basis of a promissory estoppel claim; this is not a promise that can be enforced.  *Cf. Allied Vista*, 987 S.W.2d at 141 ("The function of the doctrine of promissory estoppel is, under our view, defensive in that it estops a promisor from denying the enforceability of the promise."); *Clardy*, 88 F.3d at 360 (noting that Texas courts have recognized promissory estoppel also requires a finding that "injustice can be avoided only by the enforcement of the promise").

The second statement that Karna claims forms the basis of his misrepresentation and promissory estoppel claims is a representation by McElhaney that Karna would be paid at the top of the G pay grade if he agreed to become a salaried employee. (*See* Pl.'s Resp., at 30–31.) Karna admits that, at the time the promise was made, he did not know what the range of the G pay grade was. (Pl.'s Resp., Ex. A, Karna Aff. ¶ 65.) Karna could not reasonably and justifiably rely on such a vague and undefined salary representation. This is all the more so because, by September 11, 2009, Karna had a formal offer letter, which unambiguously told him that his salary would be $125,000. (Def.'s Mot., Ex. A-2, September 11, 2009 email enclosing September 10, 2009 offer letter from McElhaney to Karna.) Even assuming that Karna could justifiably rely on such a statement before, once he received a formal offer letter indicating a specific base salary, he certainly could not continue justifiably to rely on conflicting and ill-defined oral representations. A person of Karna's experience and intelligence, who had worked at a number of different companies in the past and who had multiple graduate degrees, could not have reasonably and justifiably relied on any oral representation about a base salary that directly contradicted the base salary noted in his offer letter.

Karna's Amended Petition points to an additional alleged promise: statements by BP that he would continue to be compensated at the same level as when he was an hourly employee should he accept the salaried position. (Doc. No. 1, Ex. A-2G, Pl.'s First Am. Pet. ¶ 61.) First, this statement is itself vague, as Karna's compensation while he was an hourly employee spanned quite a range: it was $352,082.50 in 2008 and $294,392.04 in 2009. (*See* Def.'s Mot., Ex. D-9, Ideal Form 1099s.) Furthermore, this representation conflicted with Karna's allegations that, in a meeting on July 29, 2009, McElhaney and Adams promised Karna a base salary of $140,000, a sign-on bonus of $40,000, and a VPP of 30%, which would be a total annual

compensation of $220,000.  (Pl.'s Resp., Ex. A, Karna Aff. ¶ 90.)  Finally, even putting aside these difficulties, Karna certainly could not have continued to reasonably rely on oral representations that his compensation would not change once he received the September 10, 2009 offer letter indicating his base salary would be $125,000, his signing bonus would be $10,000, and the target VPP for someone making his salary would be $18,750.  (Def.'s Mot., Ex. A-2, September 10, 2009 Offer letter from McElhaney to Karna; Def.'s Mot., Ex. A-2, Total Rewards Statement.)

For the reasons explained above, BP's Motion for Summary Judgment on Karna's promissory estoppel claim is **GRANTED**.

### G.    Wrongful Discharge

Texas is an employment-at-will state.  *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993) (citing *Schroeder v. Tex. Iron Works*, 813 S.W.2d 483, 489 (Tex. 1991) and *East Line & R.R.R. Co. v. Scott*, 72 Tex. 70, 10 S.W. 99, 102 (1888)).  This means "Texas law generally allows an employer to discharge an employee for a good reason, a bad reason, or no reason at all."  *Figueroa v. West*, 902 S.W.2d 701, 705 (Tex. App.—El Paso 1995, no writ) (citing *Vida v. El Paso Emps.' Fed. Credit Union*, 885 S.W.2d 177, 180–81 (Tex. App.—El Paso 1994, no writ).  One exception to this general rule was announced in *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).  In *Sabine Pilot*, the Texas Supreme Court held that an employee may sue for wrongful discharge if the employee was discharged solely for refusing to engage in illegal conduct.  *Sabine Pilot*, 687 S.W.2d at 735.

"In order to establish a *prima facie* case of wrongful termination under *Sabine Pilot,* the plaintiff must prove that: (1) she was required to commit an illegal act which carries criminal penalties; (2) she refused to engage in the illegality; (3) she was discharged; (4) the sole reason

for her discharge was her refusal to commit an unlawful act. *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003) (citing *Sabine Pilot*, 687 S.W.2d at 735; *Burt v. City of Burkburnett*, 800 S.W.2d 625, 626-27 (Tex. App.—Fort Worth 1990, writ denied)).  Under Texas law, the element of discharge may be satisfied with constructive discharge as well as actual discharge.  *Nguyen v. Technical & Scientific Application, Inc.*, 981 S.W.2d 900, 902 (Tex. App.—Houston [1st Dist.] 1998, no pet.).  "An employee is constructively discharged when job conditions are made so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Marx v. Elec. Data Sys. Corps.*, --- S.W.3d ---, No. 07–08–00022–CV, 2009 WL 1875505, at *3 (Tex. App.—Amarillo June 30, 2009, no pet.) (citing *Kosa v. Dallas Lite & Barricade, Inc.*, 228 S.W.3d 428, 430 (Tex. App.—Dallas 2007, no pet.)); *Nguyen*, 981 S.W.2d at 902 (citing *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 177 (Tex. App.—Houston [14th Dist.] 1991, no writ)).

BP moves for summary judgment on Karna's wrongful discharge claim, arguing that (1) Karna has not shown he was required to do anything illegal, (2) the conditions Karna complains of do not rise to the level of constructive discharge as a matter of law, and (3) Karna has no evidence that the sole reason for his alleged constructive discharge was his refusal to engage in illegal conduct.  (Def.'s Mot., at 28–30; Def.'s Reply, at 1–5.)  Karna responds that (1) Ray's request that Karna create anonymous IDs to access WR5 and conceal any tickets showing the creation of those IDs constituted a request to violate a provision of the Sarbanes-Oxley Act; (2) repeated requests to violate the law are themselves conditions so intolerable that a reasonable person would be compelled to resign; and (3) BP has offered no other explanation for the intolerable conditions Karna was allegedly subjected to.  (Pl.'s Resp., at 17–25; *see generally* Doc. No. 49, Pl.'s Surreply to Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J.)

Here, the basis for Karna's claim is a request by Ray to create anonymous ID and conceal the tickets indicating those IDs had been created, which Karna contends is a violation of the Sarbanes-Oxley Act.  (Pl.'s Resp., Ex. B. Karna Aff. ¶¶ 13–15.)[9]  Karna also identifies a number of subsequent incidents in late 2010 and early 2011 when Ray and Adams asked him to engage in allegedly illegal activities.  (*See id.* ¶¶ 24–29.)  Karna contends that repeated requests to violate the law constitute conditions so intolerable that a reasonable employee would have felt compelled to resign.  (Pl.'s Surreply, at 3.)  He cites a number of cases from other states for this proposition.  *See Strozinsky v. Sch. Dist. of Brown Deer*, 614 N.W.2d 443, 464 (Wis. 2000) (stating that, intolerable conditions required for constructive discharge exist "when the employer requests or requires an employee to engage in illegal acts"); *Smith v. Brown-Forman Distillers Corp.*, 241 Cal. Rptr. 916, 922 (Ct. App. 1987) (noting that trial court determined, without opposition from either party, that "to require an employee to violate a law is, itself, outrageous conduct to amount to a constructive discharge"); *Anderson v. First Century Fed. Credit Union*, 738 N.W.2d 40, 48 (S.D. 2007) (stating that "intolerable conditions [required to establish a constructive discharge] may arise when an employer requests or requires an employee to take part in illegal activity"); *Mills v. Mason Consol. Sch. Dist.*, No. 07-CV-14648, 2008 WL 4457808, at *9 (E.D. Mich. Sept. 30, 2008) (noting that "inducing or requiring the commission of fraud or illegal activity" are the "type of severe conditions" that would warrant a finding of constructive discharge); *Hertzoff v. Diaz*, 533 F. Supp. 2d 470, 473 (S.D.N.Y. 2008) (finding claim for constructive discharge adequately pled, "on the ground that defendants asked [plaintiff] to perform illegal acts and rendered it impossible for him to perform the work").  Notably, Karna

---

[9] For the purposes of this Memorandum and Order, the Court assumes without deciding that the acts Karna was requested to perform were indeed illegal.

does not cite any Texas cases that have so held.  BP contends that requests to perform illegal conduct should not, in and of themselves, be sufficient.  (Def.'s Reply, at 4.)

The Court need not resolve this dispute.  Even assuming that Texas courts would agree with those state courts that have held that requests to engage in illegal conduct are themselves intolerable conditions that would support constructive discharge, Karna still must prove that the actions taken against him which led him to resign were taken for the sole reason that he refused to commit a crime.  *See Marx*, 2009 WL 1875505, at *5.  Here, Karna argues that the repeated requests to engage in illegal conduct were the intolerable conditions that forced him to resign.  (Pl.'s Resp., Ex. B. Karna Aff. ¶ 30; Pl.'s Surreply, at 3.)  Karna has produced no evidence indicating that subsequent requests to engage in illegal conduct were a result of Karna's initial refusal to engage in illegal conduct.  Contrary to Karna's assertion, it is he, not BP, who bears the burden of proving causation.  (*See* Pl.'s Surreply, at 4 (arguing that BP has not come forward with any other explanation for the repeated requests to engage in illegal conduct).)  As *Marx* explained, "mere temporal proximity between protected conduct and adverse action is insufficient to show a causal link."  *Marx*, 2009 WL 1875505, at *6 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) and *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004)).  Furthermore, Karna's own affidavit suggests that he was not being subjected to requests to engage in illegal conduct because of an initial refusal to engage in illegal conduct; rather, Karna himself posits that he was asked to do these things as a cost-saving measure.  (Pl.'s Resp., Ex. B. Karna Aff. ¶ 30.)  Karna also posits that Ray was "attempting to force me out."  (Pl.'s Resp., Ex. B. Karna Aff. ¶ 31.)  However, such "subjective opinions of the motivation for his employer's actions [are not] sufficient to raise a fact issue defeating summary judgment."  *Marx*, 2009 WL 1875505, at *7 (citing *Tex. Division-Tranter,*

*Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) and *Robinson v. The Devereux Found.*, No. 14-01-00081-CV, 2002 WL 1315631 (Tex. App.—Houston [14th Dist.] June 6, 2002, pet. denied) (mem. op.)).

Karna also contends that, as a result of his refusal to provide the IDs, Ray became unduly sarcastic toward him, refused to delegate financial authority to him or name him CET owner of WR5, refused to allow him to use vacation time that he was previously told he could carry over to the following year, and Ray withheld information from him regarding WR5.  (*Id.* ¶¶ 19–23.) However, Karna also provides no proof that the sole reason he was subjected to these acts was his refusal to engage in illegal conduct.  Indeed, Karna contends he was not made CET owner before the requests to engage in illegal conduct began in late 2010.  (*See* Pl.'s Resp., Ex. A, Karna Aff. ¶¶ 67–68 (noting that Adams remained set owner the entire time Karna was WR5/ER5 Applications Support Manager).)  Furthermore, even if Karna could show the requisite causation, these other acts he complains of do not constitute constructive discharge as a matter of law.  Allegations of derogatory comments have not been found to rise to the level of constructive discharge.  *See Hammond*, 821 S.W.2d at 177–78 (citing *Shawgo v. Spradlin,* 701 F.2d 470, 481–82  (5th Cir. 1983)).  Furthermore, a transfer with an attendant loss of some responsibilities has also not been found to rise to the level of constructive discharge.  *See Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755 (5th Cir. 1986), *aff'd in part,* 491 U.S. 701 (1989).

The Court need not address the remainer of the parties' arguments as to the wrongful discharge claim.  BP's Motion for Summary Judgment on this claim is **GRANTED** because Karna has brought forth no evidence that the allegedly intolerable conditions he was subjected to were caused solely by his refusal to engage in illegal conduct.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that Defendant's Motion for Summary Judgment (Doc. No. 17) and Amended Motion for Summary Judgment (Doc. No. 45) must be **GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendant's motion must be **DENIED** as to Plaintiff's claims that he was an employee within the meaning of the FLSA between May 2, 2008 and October 19, 2009;

- Defendant's motion must be **DENIED** as to whether Plaintiff fell into the computer professional exemption of the FLSA between May 2, 2008 and February 22, 2011;

- Defendant's motion must be **GRANTED** as to whether Plaintiff fell into the highly compensated employee exemption of the FLSA between October 19, 2009 and February 22, 2011;

- Defendant's motion must be **GRANTED** as to Plaintiff's claim quantum meruit claim;

- Defendant's motion must be **DENIED** as to Plaintiff's breach of contract claim;

- Defendant's motion must be **GRANTED** as to Plaintiff's negligent misrepresentation claim;

- Defendant's motion must be **GRANTED** as to Plaintiff's fraudulent misrepresentation claim;

- Defendant's motion must be **GRANTED** as to Plaintiff's promissory estoppels claim; and

- Defendant's motion must be **GRANTED** as to Plaintiff's wrongful discharge claim.

Plaintiff's Motion for Partial Summary Judgment (Doc. No. 11) must be **GRANTED IN PART** and **DENIED IN PART** as follows:

- Plaintiff's motion must be **GRANTED** as to Plaintiff's claims that he was an employee within the meaning of the FLSA between May 2, 2008 and October 19, 2009; and

- Plaintiff's motion must be **DENIED** as to whether Plaintiff fell into the computer professional exemption of the FLSA between May 2, 2008 and February 22, 2011.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 19th day of March, 2013.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE